**BRINDERSON CORPORATION, Appellant,**

v.

**HAMPTON ROADS SANITATION DISTRICT, Appellee,**

v.

**GANNETT, FLEMING, CORDDRY AND CARPENTER; Ralph B. Carter Company, Third-Party Defendants.**

No. 86–3949.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 9, 1986.

Decided Aug. 4, 1987.

As Amended on Denial of Rehearing Sept. 8, 1987.

David G. Lane (Lewis J. Baker; Dorothy E. Terrell; Lewis, Mitchell & Moore, Vienna, Va., on brief), for appellant.

George D. Ruttinger (Michael J. Denton; Crowell & Moring, Washington, D.C., Herbert V. Kelly; Conway H. Shield; Robyn C. Hylton; Jones, Blechman, Woltz & Kelly, P.C., Newport News, Va., on brief), for appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

When a construction project goes poorly and costs exceed contract prices, litigation may be a natural consequence as the parties seek to determine the extent to which blame should be allocated between such independent forces as extraordinary weather, the owners, who, through retained engineers, supplied site data and project specifications, and the general contractor responsible for the supervision and performance of the construction work. This is such a case brought here by the general contractor dissatisfied with the partial relief obtained in the district court.

With respect to one claim, we reverse and remand to the district court for a new trial; as to the other claims, we affirm.

### I.

Hampton Roads Sanitation District is a political subdivision of the Commonwealth of Virginia responsible for the collection and treatment of waste water discharged in several cities and counties of the Tidewater section of Virginia. In 1974, HRSD contemplated the construction of a new waste water treatment facility in York County. It engaged the architectural/engineering firm of Gannett, Fleming, Corddry and Carpenter for preliminary studies of the site, its topography and soil. The results of those studies were made available to prospective bidders.

Aided by a grant of $17,000,000 from the United States Environmental Protection Agency, in the fall of 1979, HRSD entered into a contract with the Brinderson Corporation for construction of a plant in accordance with plans and specifications provided by GFCC. The contract price was $21,600,000 and the scheduled completion date was September 27, 1982.

Brinderson began work at the site in February 1980. Almost from the beginning, however, it encountered unusually wet conditions from excessive rain and snowfall. Early on, it drilled a test hole and complained to GFCC's resident engineer that the soil was wet and would not support heavy equipment. In a report to GFCC in May 1980, Brinderson complained that its equipment had been "unable to move due to swamp-like conditions."

Brinderson was granted some extension of the completion date because of unusually wet weather, but the project was not completed until October 24, 1983, approximately thirteen months after the scheduled completion date. Brinderson was assessed the liquidated damage penalty, provided for in the contract for the delay between the extended completion date and October 24, 1983.

On January 13, 1984, Brinderson filed a "Request for Equitable Adjustment," in which it sought additional compensation in the amount of $4,842,083. The claimant based its request, in part, upon a site condition which Brinderson claimed was materially different from that indicated in the contract documents, in part, upon the alleged delay in the redesign of an odor control system under Change Order No. 13, and, in part, upon HRSD's refusal to accept a substitute sludge conveyor system proposed by Brinderson.

This action was filed after the parties were unable to adjust their differences. By agreement, the case was tried before a magistrate and a jury.

### II.

The substantial dispute between the parties about the facts underlying the differing site conditions claim was not submitted to the jury. The magistrate directed a verdict for HRSD as to that claim upon the ground that Brinderson had not given timely, formal written notice to HRSD as provided in Supplemental Condition 3.

Supplemental Condition 3 is mandatory in construction contracts when the Environmental Protection Agency provides substantial funding for the project. It provides:

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Owner in writing of (1) sub-surface or latent physical conditions at the site differing materially from those indicated in this contract or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this contract. The Owner shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

(b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above; provided, however, the time prescribed therefor may be extended by the Owner.

Brinderson concedes that it did not give formal written notice of its differing site conditions claim until November 16, 1982.

In directing a verdict for the defendant, the magistrate ruled that Virginia's courts would give a literal reading to the section and disallow a claim based upon a materially different site condition unless there had been timely, written notice to the owner. He found an analogy in the old case of *Atlantic & Danville Railway Co. v. Delaware Construction Co.*, 98 Va. 503, 37 S.E. 13 (Va.1900).

The *Atlantic and Danville Railway* case is not comparable. It dealt with a claim for extra work by a contractor claiming to have performed extra work under a contract which provided that there should be no claim for extra work unless the extra work was excessive and the compensation payable therefor had been previously agreed upon by the railroad's engineer. There was a dispute as to whether any extra work had been performed, but it was clear that the railroad's engineer had approved no extra work nor had he agreed upon the compensation to be paid for it. That situation is far from that presented in this case in which the owner's engineers were fully informed of all of the contractor's developing information about the site.

There seem to be, however, no more relevant Virginia cases. Thus it cannot be said with assurance what construction Virginia's courts would give to Supplemental Condition 3 if it looked for guidance only to its precedents.

Brinderson contends, however, that federal law should control the construction of the contract either under the exception of *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) or because there is a developed body of federal law construing this federally imposed contract provision. We are not persuaded by the *Clearfield Trust Co.* conten-

tion, but agree that the Supreme Court of Virginia would follow federal interpretive precedents.

■ Supplemental Condition 3 is required not only by the EPA, but by other federal agencies, so that it is found in a variety of contracts, including defense contracts. It has been the subject of litigation in the Court of Claims and in several boards of contract appeals. In those cases, the notice provision has not been given a literal construction. A more liberal approach, focusing on the purpose of the clause, has been adopted. Generally, when the owner has actual or constructive notice of the conditions underlying the claim and an opportunity to investigate, that is sufficient. *Hoel-Steffen Construction Co. v. United States*, 456 F.2d 760, 767–8, 197 Ct.Cl. 561 (1972); *Leiden Corp.*, ASBCA No. 26136, 83–3 BCA (CCH) ¶ 16,612; *C & L Construction Co.*, ASBCA Nos. 22993, 23040, 81–1 BCA (CCH) ¶ 14,943; *Davis Decorating Service*, ASBCA No. 17,342, 73–2 BCA (CCH) ¶ 10,107.

■ When a standardized provision widely used in construction contracts receives consistent judicial and administrative interpretation, it acquires a gloss that lends color to the words. When the same words are incorporated in later contracts, it may be presumed that the intention of the parties conforms to the earlier, consistent judicial and administrative interpretation. If, at the beginning, the words were ambiguous in the sense that they were open either to a strict, technical construction or to a more liberal construction in furtherance of their purpose, consistent judicial and administrative rulings that they are to be interpreted with liberality dissolve the ambiguity until, finally, there is no room for a contention that they should be construed strictly.

■ We are confident that the Supreme Court of Virginia, if called upon to construe or apply this federally mandated provision, would look to the existing body of precedents. That collection of precedents is federal, but it is highly relevant, since the provision is used under federal man-

dates. There are no comparable precedents in Virginia decisions, and the Virginia courts would recognize the principle that use of the same words in contracts derives life and meaning from earlier consistent judicial and administrative construction of them.

Though no formal written notice was given by Brinderson directly to HRSD until late in the day, GFCC's engineers, representatives of the owner, were on the site and aware of the problems, and they had abundant opportunity to inspect and investigate. This satisfied the notice requirement. Hence, the differing site condition claim should have been submitted to the jury for a decision on the merits.

### III.

▇ GFCC's engineers computed the weight bearing capacity of the soil at the site as having a California Bearing Ratio of 10, and they designed the roadway into the site upon that basis. There is no doubt that the initial design of the roadway was inadequate and that the roadway had to be redesigned and reconstructed. Indeed, Brinderson obtained an equitable adjustment in a substantial amount on that account.

Brinderson, nonetheless, complains that it should have been permitted to offer the testimony of its expert witness, Dr. Ronald E. Smith, critical of GFCC's assumptions about the weight bearing quality of the soil. It contends that the testimony was relevant to its differing site condition claim. The contract documents, however, contain no reference to any California Bearing Ratio determination. In order to prevail on the differing site condition claim, Brinderson must show conditions "differing materially from those indicated in the contract" or differing materially from those ordinarily encountered and generally recognized in work of the character provided for in this contract." No California Bearing Ratio value is disclosed in the contract documents, however. Nor has Brinderson shown that Dr. Smith's proffered testimony has any relevance to a possible claim that the conditions encountered differed materially from those ordinarily encountered. In short, the magistrate properly excluded the proffered testimony as irrelevant.

### IV.

▇ For the sludge dewatering system, the contract called for a Serpentix conveyor or its equal. Brinderson proposed the use and installation of a Flexowall conveyor which it could procure at a cost of some $40,000 less than the cost of a Serpentix conveyor. GFCC sent an engineer to New York to observe a Flexowall conveyer in operation. She reported that the Flexowall had an inferior cleaning system. She reported that its use would require that the conveyor be shut down more frequently and that personnel spend more time in cleaning processes. Permission to use the Flexowall was declined.

Brinderson's claim for extra compensation because of the refusal to approve use of the Flexowall was submitted to the jury. It offered evidence that the Flexowall was suitable for the intended purpose of moving sludge, but the jury found against it.

On appeal, Brinderson contends that a verdict on that claim should have been directed in its favor. At best, however, Brinderson's evidence only created a conflict in the evidence. The engineer's report that a Flexowall cleaning system was inferior and that its use would be more costly in operation provides support for the jury's verdict.

### V.

▇ During the progress of the work, the odor control unit was redesigned and Change Order 13 was executed granting Brinderson an additional $273,609 to procure and install the redesigned unit. That work was not completed until after July 1983, but the jury found that Brinderson was not entitled to any extension of time because of work on the change order, and the court denied a motion for a new trial on the time extension claim.

The jury granted a time extension because of unusual weather conditions, and its denial of a further extension on account

of Change Order 13 affected Brinderson's liability for liquidated damages for delay.

The district court applied a "critical path" analysis. Work required by Change Order 13 went on long after the contract completion date, but the project was far behind schedule when Change Order 13 was executed, and the work on Change Order 13 was completed several months before the entire project was completed.

The "critical path" analysis would provide an extension of time for Brinderson only to the extent that work under the change order actually delayed completion of the project. To the extent that occurred, Brinderson would have been entitled to a time extension, but there was abundant basis for the jury's conclusion that the work required by Change Order 13 did not affect the project completion date. Other work went on for several months after the redesigned odor control unit had been installed.

The motion for a new trial on that claim was properly denied.

## VI.

■ Finally, Brinderson sought reimbursement for allocable fixed home office expenses during the period of delay for which it was not responsible, but it made no showing that those fixed expenses would have been less had there been no delay or that the delay interfered in any way with the conduct of other business. Since it failed to show any loss with respect to its fixed home office expenses caused by the delay, it was entitled to no reimbursement.

## VII.

Brinderson is entitled to a trial on the merits on its claim of equitable adjustment because of differing site conditions, but we find no merit in any of its other claims.

AFFIRMED IN PART, REMANDED IN PART.