**PERINI CORPORATION, Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

**No. 97 Civ. 4808(SAS).**

United States District Court,
S.D. New York.

Aug. 11, 1998.

K. Richard Marcus, Randy J. Heller, McDonough Marcus Cohn Tretter Heller & Kanca, L.L.P., New York City, for Plaintiff.

Michael D. Hess, John de P. Douw, Corporation Counsel of the City of New York, New York City, for Defendant.

## AMENDED OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Perini Corporation ("Perini") filed a Complaint on June 24, 1997, asserting claims for multiple breaches of contract. On November 17, 1997, Perini moved for partial summary judgment on its third cause of action, which seeks an equitable adjustment for increased costs associated with the issuance of "change orders" on its contract with defendant City of New York ("City"). On January 6, 1998, defendant opposed Perini's motion and cross-moved for partial summary judgment on the same cause of action.

### I. Legal Standard for Summary Judgment

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Once such evidence is identified, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-movant on a material issue of fact, summary judgment is improper. *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir.1997).

In determining whether summary judgment should be granted, the court resolves

all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir.1998). However, the moving party is not required to affirmatively disprove unsupported assertions made by the non-movant, *see Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and if the evidence presented by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas,* 143 F.3d 105 (2d Cir.1998) (quoting *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505). The court must also examine "the substantive law applicable in the underlying litigation since that law dictates which facts are material." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir. 1993) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

When both parties move for summary judgment, "a district court is not required to grant judgment as a matter of law for one side or the other. 'Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (quoting *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981)). However, where the material facts relevant to the disposition of both plaintiff's and defendant's motions are largely undisputed, both motions may be decided simultaneously. *See Turner v. General Motors Acceptance Corp.,* 980 F.Supp. 737, 739 (S.D.N.Y.1997) (citing *Heublein* for the proposition that cross-motions are evaluated independently, but deciding motions together where material facts are not in dispute).

## II. Factual Background

The following facts are not disputed unless otherwise indicated. On or about December 21, 1993, Perini and the City entered into a binding construction contract, designated "Contract 20G," pursuant to which Perini agreed to upgrade and expand the structures and equipment at the Coney Island Water Pollution Plant (the "Project") for $40,985,000. *See* Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1") at ¶¶ 1–2; Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1") at ¶¶ 1–2; Complaint at ¶ 7.

## A. Contract Provisions

An E.P.A. grant funding 55% of the Project required the incorporation of federal regulation 40 C.F.R. Chapter 1, Subchapter B, including 40 C.F.R. § 33.1030(3)(d) ("Changes Clause") and 40 C.F.R. § 33.1030(1) ("Supersession Clause"), into Contract 20G. *See* Affidavit of Joseph Terracciano, Director of Revenue and Claims for the Department of Environmental Protection of the City ("Terr.Aff.") at ¶¶ 5–7; Terr.Aff., Ex. D; Plaintiff's Memorandum of Law ("Pl.'s Mem.") at 1. The Changes Clause provides that an owner may by written order modify the contractor's work under the contract. If such a change "causes an increase or decrease in the contractor's cost ..., an equitable adjustment shall be made and the contract modified in writing accordingly." In order "to assert a claim for an equitable adjustment under this clause, ... [a contractor] must, within 30 days after receipt of a written change order ..., submit to the owner a written statement setting forth the general nature and monetary extent of such claim." The Supersession Clause provides that the "clauses [under 40 C.F.R. § 33.1030, including the Changes Clause,] supersede any conflicting provisions of this subagreement."

In addition to these federally mandated clauses, Contract 20G includes standard contract provisions that provide for the issuance of contract changes (Article 25), determination of methods of payment (Article 26), and notice and documentation of claims (Articles 27 and 54). Article 25, "Contract Changes," states: "The Contractor shall be entitled to a price adjustment for extra work performed pursuant to a written change order.... Any Construction Contract increase ... that cumulatively exceed[s] the greater of 10% or $50,000 shall be approved, in writing, by the Office of Construction." City's Cross–Motion for Partial Summary Judgment ("City's C–M"), Ex. A at p. 44. The computation of

compensation for extra work performed pursuant to change orders issued by the City is determined under Article 26, "Methods of Payment for Extra Work," by either applicable unit prices, a "cost plus a percentage" method, or a negotiated payment. *Id.* at pp. 45–46. Article 27, "Disputed Work, Determination or Order," sets forth notice and documentation requirements:

> If the Contractor shall also claim to be sustaining damages by reason of any act or omission of the City or its agents, [it] shall within five (5) days after the sustaining of such damage, notify the Commissioner in writing and within (30) days thereafter ... submit to the Commissioner verified detailed statements of the damages sustained together with documentary evidence of such damages. On failure of the Contractor to fully comply with the foregoing provisions, such claims shall be deemed waived and no right to recover on such claims shall exist.

*Id.* at p. 46. Article 54 further mandates strict compliance with notice provisions: "No claims against the City for damages for breach of Contract or compensation for extra work shall be made or asserted in any action or proceeding at law or in equity, unless the Contractor shall have strictly complied with all requirements relating to the giving of notice and of information with respect to such claims as have been herein provided." *Id.* at p. 73.

## B. Change Orders

The City issued change orders (1) modifying the replacement of six existing 48–inch valves with new 54–inch valves, (2) modifying the rehabilitation of the existing main sewer pump motors, and (3) following the scheduled completion date of September 13, 1996. *See* Pl.'s 56.1 at ¶¶ 6–15, 26; Def.'s 56.1 at ¶¶ 6–15, 26. The change orders on the valve and motor work addressed problems encountered in Perini's performance of the contract, while the "Post–Completion" orders addressed miscellaneous changes to Perini's work after September 13, 1996.

First, problems arose regarding the valve work when the designated manufacturer, Crane, declined to manufacture them accord-

ing to contract specifications. *See* Supplemental Affidavit of Slavko Pudar, Plaintiff's Engineer ("Pudar Supp. Aff.") at ¶ 15; Reply Affidavit of James H. Martinez, Defendant's Engineer ("Mart. Reply Aff.") at ¶ 4; Pudar Aff., Ex. E at unnumbered pp. 1–2. In response to this problem, the City modified the valve specifications by letter dated June 28, 1994 and issued Change Orders 20G–33 ("Improvements to the Main Sewage Pump Inlet Valve Operators") on July 21, 1995, and 20G–42 ("Modifications at the Main Sewage Pump Gate Valve Actuator Platforms") on January 30, 1996. *See* Pudar Aff., Ex. D at unnumbered pp. 1–7 and Ex. E at unnumbered pp. 4–6; Pudar Supp.Aff. at ¶ 29. The City also eliminated Perini's obligation to install three of the valves required by Contract 20G. *See* Mart.Aff. at ¶ 18.

Perini claims that it notified the City by letters dated February 18, April 25 and July 11, 1994, of increased costs caused by these change orders. *See* Pudar Supp.Aff. at ¶¶ 29, 29(a). The February 18, 1994 letter requested a meeting to discuss the valve specifications in light of Crane's refusal to produce the valves as specified. *See* Affidavit of Zohrab B. Marashalian, President of Plaintiff's Metro Division ("Marash.Aff."), Ex. 5 at unnumbered p. 1. In its April 25, 1994 letter, Perini informed the City that it anticipated both a delay from the City's rejection of Crane's alternative design and a need to request a time extension in the future pursuant to Article 11 of Contract 20G. *Id.* at unnumbered pp. 2–3. In the July 11, 1994 letter, Perini stated that "[w]hen the true costs are determined for this redesign [of the valves] we will then address that issue along with the appropriate lost time." *Id.* at unnumbered p. 4.

A second problem arose when repairs to the motors exceeded the budget provided in the contract. *See* Mart.Aff. at ¶ 20. The City issued Change Orders 20G–58 ("Improvements and Installation of Spare Main Sewage Pump Motor") on January 16, 1997, 20G–60 ("Additional Repairs to Main Sewage Pump (MSP) Motor Nos. 2 thru [sic] 6") on January 16, 1997, and 20G–68 ("Emergency Repairs and Improvements to Spare Main Sewage Pump Motor S/N–163") on April 15,

1997. *See* Marash Aff., Ex. 8 at unnumbered pp. 1–6; Pudar Aff., Ex. C at unnumbered pp. 37–39. The City also canceled all contract and change order work on three of the motors by letter dated June 6, 1997. *See* Marash.Aff., Ex. 8 at unnumbered p. 11; Mart.Aff. at ¶ 21.

Perini claims that it notified the City by letters dated June 26, July 1, October 4, November 8, November 20 and November 25, 1996, and January 28, March 4, and March 17, 1997, of its increased costs resulting from these change orders.[1] *See* Pudar Supp.Aff. at ¶¶ 29, 29(b). In the June 26, 1996 letter, Perini discussed rehabilitation of the motors and a delay in the work schedule, and requested either the elimination of work on the motors or the issuance of a time extension and change order. *See* Marash. Aff., Ex. 7 at unnumbered pp. 1–3. The July 1, 1996 letter requested compensation for continuing delays and provided a breakdown of "additional costs which have been and will continue to be incurred in order to accelerate the completion of the remaining pumps," including overhead and profit. *Id.* at unnumbered pp. 4–9. In the September 3, 1996 letter, Perini asked the City to issue a change order for $1,341,578 in order to compensate it for costs it incurred in rehabilitating the motors.[2] *See* Pudar Supp.Aff., Ex. O. In the October 4, 1996 letter, Perini also requested compensation of $3,771,615 for the increased costs incurred as a result of numerous difficulties it encountered during contract performance in general, including the valve replacement and motor improvements. *See* Marash. Aff., Ex. 9 at unnumbered pp. 1–8. The November 8, November 20 and November 25, 1996 letters reiterate requests for reports on the deficiencies of one of the

Motors. *See* Marash.Aff., Ex. 7 at unnumbered pp. 12–15. In the January 28, 1997 letter, Perini informed the City of the motor repair vendor's refusal to warranty its work and requested further direction. *Id.* at unnumbered pp. 16–17. In the March 4, 1997 letter, Perini requested an equitable adjustment of $11.6 million as compensation for increased costs resulting from changes to Contract 20G, including the valve design and the specifications providing for the motor rehabilitation. *See* Marash. Aff., Ex. 9 at unnumbered pp. 9–10. In the March 17, 1997 letter, Perini demanded that change orders regarding its work on the motors be finalized, including "all outstanding costs." *See* Marash.Aff., Ex. 7 at unnumbered pp. 18–19.

The City also issued a number of change orders subsequent to Contract 20G's scheduled completion date of September 13, 1996. *See* Pl.'s 56.1 at ¶ 26; Def.'s 56.1 at ¶ 26. The following change orders were issued between September 23, 1996 and September 23, 1997: 20G–53, dated September 23, 1996; 20G–54, dated September 23, 1996; 20G–55, dated October 9, 1996; 20G–56, dated October 9, 1996; 20G–57, dated October 2, 1996; 20G–58, dated January 17, 1997; 20G–59, dated December 23, 1996; 20G–60, dated January 16, 1997; 20G–61, dated January 16, 1997; 20G–62, dated January 8, 1997; 20G–63, dated January 28, 1997; 20G–64, dated February 12, 1997; 20G–65, dated February 18, 1997; 20G–66, dated April 11, 1997; 20G–67, dated April 4, 1997; 20G–68, dated April 15, 1997; 20G–69, dated August 12, 1997; 20G–70, dated prior to May 19, 1997[3]; 20G–71, dated September 23, 1997. *See* Pudar Aff., Ex. C. Perini asserts that it notified the

1. In its first submission, Perini does not claim that the letters dated November 8 and November 20, 1995, or the letters dated October 4, 1996 and March 4, 1997 provided notification to the City of its increased costs resulting from change orders modifying work on the motors; instead, it claims in an affidavit submitted in November 1997 that the latter two letters notified the City of increased costs resulting from change orders issued subsequent to the scheduled completion date. *See* Marash.Aff. at ¶ 18. However, in an affidavit submitted in April 1998, Perini claims for the first time that these letters constituted notice of increased costs caused by modification

of work on the motors. *See* Pudar Supp.Aff. at ¶ 29.

2. Perini does not directly refer to this letter to support notification regarding increased costs in the motor work, although it does allege that this letter gives notice of "the approximate monetary extent" of its claim. Supplemental Affidavit of K. Richard Marcus, Plaintiff's Attorney ("Marcus Supp.Aff.") at ¶ 30.

3. Change Order 20G–70 was received by Perini on May 19, 1997; the issuance date does not appear on the document.

City of its claims arising from these change orders by letters dated October 4, 1996 and March 4, 1997, as well as its Notice of Claim and complaint dated June 24, 1997. *See* Pudar Supp.Aff. at ¶ 29; Marash Aff. at ¶ 18(c).[4]

It is undisputed that Perini and the City have negotiated lump sum payments for at least the direct costs associated with these change orders. *See* Pl.'s Reply Mem. at 5; Def.'s Mem. at 5. The City contested Perini's claimed entitlement to compensation for its indirect costs under the Changes Clause beyond the "accurate, complete and current" costs approved by both parties. *See* Def.'s Reply Mem. At 6; Pl.'s Reply Mem. at 3. Perini brought this action on June 24, 1997.

## III. Jurisdiction

■ Jurisdiction over this matter is predicated on 28 U.S.C. § 1332, as stated in the Complaint, not on 28 U.S.C. § 1331 as Perini incorrectly argues. *See* Pl.'s Supp.Mem. of Law at pp. 2–3. Federal question jurisdiction exists only where (1) a federal law creates the cause of action, or (2) a state cause of action presents a substantial federal question. *See West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 192 (2d Cir.1987). The incorporation of the EPA procurement regulations at issue here into a municipal construction contract does not give rise to federal question jurisdiction. *See J.A. Jones Construction Co. v. City of New York*, 753 F.Supp. 497, 499 (S.D.N.Y.1990) (incorporation of EPA procurement regulations "that define how to calculate additional payments for change orders and delays" into contract does not create federal question jurisdiction); *see also Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89 (5th Cir.1986) ("[W]e are aware of no case in which any court ... has held that a private contract can give rise to federal question jurisdiction simply by 'incorporating' some

4. Perini further alleges that the following change orders also caused delays and increased its costs: 20G–46 ("Additional Repairs to Main Sewage Pump Motor No. 1 (Serial No.142)"), dated April 23, 1996; 20G–47 ("Main Sewage Pump Venting System Modifications"), dated May 30, 1996; and 20G–48 ("Electrical Disconnect Switches for the Main Sewage Pump Gate Valve Actuators"), dated June 4, 1996. *See* Pudar Aff. at ¶ 25.

federal regulatory standard that would not have been binding on the parties by its own force."). No private cause of action exists under 40 C.F.R. Part 33. *See J.A. Jones*, 753 F.Supp. at 502. Moreover, there is no substantial federal interest in this otherwise local dispute merely because one of the parties is a recipient of an EPA grant: The policy underlying these regulations indicates "an intention to delegate procurement responsibility and management to the local level to the maximum extent possible." *Id.* at 505.

## IV. Discussion

Perini provides three reasons why it is entitled to an equitable adjustment of $16,-000,000 for increased costs caused by Change Orders issued by the City. It contends that the Changes Clause supersedes purportedly conflicting standard provisions in Contract 20G; it further contends that it complied with the notice provisions of the Changes Clause as liberally construed by federal law; finally, it argues that an equitable adjustment is warranted under federal law due to defective specifications in Contract 20G and a misrepresentation made by the City.

In turn, the City argues that Perini is not entitled to summary judgment on its claim for an equitable adjustment. In fact, according to the City, it is entitled to summary judgment on that claim, because Article 26 of Contract 20G bars recovery beyond the lump sum already negotiated. It contends that Article 26 is consistent with the Changes Clause and provides for modes of payment authorized by parallel federal regulations. Further, the City claims that state law requires strict compliance with the notice provisions of Contract 20G, and that Perini has not provided the notice and documentation of claims required by Articles 27 and 54 of Contract 20G or the Changes Clause.[5]

However, it fails to even argue that it gave notice of these claims.

5. The City argues, in the alternative, that Perini waived claims for further compensation by its certification on the City's forms that costs were complete and authorized. The City contends that state law applies to the waiver issue because

## A. Applicable Law

Perini and the City dispute whether federal or state law applies in construing the Changes Clause. The application of federal or state law significantly affects the parties' obligations under Contract 20G.

■ Federal law, as developed by the Board of Contract Appeals and the Court of Claims, construes the notice provisions of the Changes Clause liberally; thus, a contractee's actual or constructive notice of the conditions underlying the claim excuses formal compliance when federal law is applied. *See Hoel–Steffen Constr. Co. v. United States,* 197 Ct.Cl. 561, 456 F.2d 760, 768 (1972) ("[N]otice provisions in contract-adjustment clauses [should] not be applied too technically and illiberally where the Government is quite aware of the operative facts."); *Copco Steel Co. v. United States,* 169 Ct.Cl. 601, 341 F.2d 590, 598 (1965) ("[L]ack of strict compliance with many kinds of contract requirements concerning writings and notifications have [sic] frequently been held to be of no consequence where the conduct of the parties have made it clear that formal adherence would serve no useful purpose."); Appeal of *Mil–Pak Co.,* Inc., ASBCA No. 19733 (March 31, 1976), 76–1 BCA ¶ 11,836, ¶ 11,836 ("Simply stated, we do not feel that a valid changes claim, filed before final payment, should be barred by a failure to give notice thereof in accordance with the appropriate provision when it is reasonably certain that the Government would not have acted differently if such notice had been given").

■ New York, on the other hand, requires strict compliance with notice provisions in public contracts as a condition precedent to the pursuit of compensation claims. *See Westinghouse Electric Corp. v. New York City Transit Auth.,* 735 F.Supp. 1205, 1224 (S.D.N.Y.1990) (noncompliance with timely notice provision barred claims for additional compensation pursuant to "New York case law recogniz[ing] that prompt, written notice requirements in public works contracts serve salutary purposes"); *Huff Enterprises, Inc. v. Triborough Bridge and Tunnel Auth.,* 191 A.D.2d 314, 595 N.Y.S.2d 178, 181 (1st Dep't.

1993) ("[E]nabl[ing] plaintiff to succeed in attempting to circumvent having to give written notice would eviserate [sic] the viability of these clauses in public works projects."); *Naclerio Contracting Co. v. Envtl. Protection Admin.,* 113 A.D.2d 707, 493 N.Y.S.2d 159, 160–61 (1st Dept.1985) (failure to comply with reporting and notice provisions of contract barred contractor's claims against the City for extra work performed).

■ The interpretation of the Changes Clause is in fact governed by state law. Federal common law applies where there is (I) a "uniquely federal interest" and (ii) a "significant conflict" between an identifiable federal policy or interest and state law. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 507, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Federal common law has been applied only in limited areas. *See, e.g., id.* at 512, 108 S.Ct. 2510 (federal law applied to determine liability of independent military contractor); *American Pipe & Steel Corp. v. Firestone Tire & Rubber Co.,* 292 F.2d 640, 644 (9th Cir.1961) (federal law applied to interpret the term "equitable adjustment" in contract "connected to national security"). The Changes Clause neither invokes a "uniquely federal interest," nor presents a "significant conflict" with state law. *See Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 920–21 (3d Cir.1995) (no uniquely federal interest in the interpretation of federally mandated provision in public housing construction contract, and no significant conflict where New Jersey courts would look to federal common law for guidance anyway); *Brinderson Corp. v. Hampton Roads Sanitation Dist.,* 825 F.2d 41, 44–45 (4th Cir.1987) (federal law only applicable because absence of state cases on point indicated that Supreme Court of Virginia would look to federal precedent for guidance).

In *Linan–Faye,* the Third Circuit found that a New Jersey District Court had wrongly applied federal common law to a federally mandated "termination for convenience" clause in a contract between a public contractor and the city housing authority. 49 F.3d at 921. The Third Circuit decided, however,

of the choice of law clause contained in the　contract.

that the New Jersey courts would look to federal common law for guidance "unless to do so would violate some enshrined principle of New Jersey law," due to the absence of New Jersey cases interpreting the effect of "termination for convenience" clauses. *Id.* at 921–22. In *Brinderson*, the Fourth Circuit applied federal common law to a "differing site condition" clause mandated in construction contracts funded by the EPA, because "the Supreme Court of Virginia would follow federal interpretive precedents" due to the lack of relevant Virginia cases. 825 F.2d at 44. The court then construed the clause's notice provisions liberally in accord with precedent developed by the Court of Claims and the Board of Contract Appeals. *Id.* at 43–44. While both courts applied federal common law, they did so only because they determined that this is what state courts would do in the absence of relevant state court precedent. Thus, both stand for the proposition that state law, not federal common law, applies to the construction of federally-imposed contract clauses. *See Brinderson*, 825 F.2d at 44 ("We are not persuaded by the *Clearfield Trust Co.*[6] contention"); *Linan–Faye*, 49 F.3d at 920 (the district court "erred" in applying federal law).

The EPA procurement regulations at issue contravene any assertion that either a "uniquely federal interest" or "significant conflict" exists in their interpretation. The intent of Congress to not usurp the authority of the states is made clear in the initial section of 40 C.F.R. Part 33: "In the construction of treatment works program[s] under the Clean Water Act ..., it is EPA's policy to delegate determinations on individual projects to State agencies to the maximum extent possible." 40 C.F.R. § 33.001(g). The regulations are "designed primarily to protect the public treasury from excessive expenditures, rather than to protect private contractors whose agreements contain provisions not as generous as those available in the regulations." *J.A. Jones*, 753 F.Supp. at 502; *see also Evansville Cement Finishers, Inc. v. Village of New Haven, Ill.*, 766 F.Supp. 692, 695 (S.D.Ill.1991); *Roger J. Au*

*& Son, Inc. v. Northeast Ohio Reg'l Sewer Dist.*, 29 Ohio App.3d 284, 293, 504 N.E.2d 1209 (1986) (The "policy underlying [the notice requirement of federally mandated 'differing site conditions' clause is] ... to make the owner aware that monetary claims for extras may be forthcoming, and to give it an opportunity to investigate the conditions and minimize costs in dealing with them."). Furthermore, a breach of contract action is "traditionally relegated to state law." *J.A. Jones*, 753 F.Supp. at 502; *see also Boyle*, 487 U.S. at 507, 108 S.Ct. 2510 ("[A] conflict with federal policy need not be as sharp [where a uniquely federal interest is present] as that which must exist for ordinary preemption when Congress legislates 'in a field which the States have traditionally occupied'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

Unlike the situations in both *Brinderson* and *Linan–Faye*, there is no indication here that state courts would look to federal interpretation of the Changes Clause for guidance. An "enshrined principle" of New York law requires strict compliance with notice provisions in general, as recently reaffirmed by the New York Court of Appeals. *See A.H.A. General Constr. v. New York City Housing Auth.*, 92 N.Y.2d 20, 33, 677 N.Y.S.2d 9, 16, 699 N.E.2d 368, 375, No. 90, 1998 WL 305439, at *7 (1998). In *A.H.A.*, the court granted the City Housing Authority's motion for summary judgment, finding that the contractor's noncompliance with notice and documentation provisions barred damage claims for extra work. *Id.* The court further stated that notice and documentation provisions serve an important public interest in that they "provide public agencies with timely notice of deviations from budgeted expenditures or of any supposed malfeasance, and allow them to take early steps to avoid extra or unnecessary expense, make any necessary adjustments, mitigate damages, and avoid the waste of public funds." *Id.* While notice provisions similar to Articles 27 and 54 of Contract 20G, rather than the

---

6. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 744, 63 S.Ct. 573, 87 L.Ed. 838 (1943), held that federal law applied to matters affecting the operation of the federal government where a uniform rule throughout the country was necessary.

Changes Clause, were specifically before the Court of Appeals in *A.H.A.,* the court's emphasis on strict compliance is directed generally at "notice and reporting requirements in public contracts." *Id.*

Perini relies on a state trial court's determination that federal law applies to the interpretation of the notice provisions of the Changes Clause. *See Schiavone Constr. Co. v. City of New York,* Index No. 5060/92 (Sup. Ct.N.Y.Co. March 8, 1996). In *Schiavone,* a contractor claimed entitlement to an equitable adjustment for damages caused by changes ordered by the City after it submitted "letters regarding the proposed changes in the work and the date of the change orders .... In each of those cases, ... [the] letter describ[ed] a claim for direct costs associated with changes in the work ... and specifically reserve[d] plaintiff's claim for an equitable adjustment." *Id.* at 11j, 11m. After determining that the Changes Clause superseded standard provisions of the contract, the trial court erroneously relied on *Bennett v. Kentucky Dep't. of Ed.,* 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), and *Au & Son, supra,* for the proposition that "federal notice requirements apply on a federally funded project" and found that the City's actual knowledge of the claims excused any untimely submission of the letters. Index No. 5060/92 at 11n.

The reasoning of *Schiavone* is unpersuasive. First, *Bennett* is clearly distinguishable. The *Bennett* Court held that "federal grant programs originate in and remained governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." 470 U.S. at 669, 105 S.Ct. 1544. However, the construction of notice requirements in a federally mandated contract clause presents an issue not addressed in *Bennett,* which dealt with a state's compliance with Title I regulations governing the use of federal education funds. *Id.* at

656, 105 S.Ct. 1544. Furthermore, Congress has expressed its intent not to usurp the authority of the state by the issuance of the EPA regulations here at issue. *See* 40 C.F.R. § 33.001(g); *J.A. Jones,* 753 F.Supp. at 505. Therefore, the application of state law to the Changes Clause not only does not conflict with *Bennett,* it also furthers Congressional policy underlying the EPA regulations.[7]

The *Schiavone* court attempts to distinguish *Linan–Faye* by noting that § 33.1030(1) ("Supersession Clause") "provide[s] that the federal regulation would supersede any contrary provision of the contract." Index No. 5060/92 at 11n. The Supersession Clause underscores the relevance of the Changes Clause. It does not, however, resolve the choice of law question: The mere fact that the Changes Clause applies does not determine how it is to be interpreted. Indeed, the Third Circuit applied state law to construe a federally mandated clause without considering the presence or absence of a supersession clause.

In sum, New York state law governs the interpretation of the notice and documentation requirements of the Changes Clause incorporated into Contract 20G. Federal common law does not apply due to (1) the lack of a uniquely federal interest and significant conflict between an identifiable federal policy and state law, and (2) the existence of state law requiring strict compliance with notice provisions in public contracts.

## B. Notice Provisions

Strict compliance with the notice and documentation provisions of the Changes Clause requires the contractor to set forth the "general nature and monetary extent" of its claim for an equitable adjustment of the contract "within 30 days after receipt of a written change order." 40 C.F.R. § 33.1030(3)(d).

7. Reliance on *Au* further undermines the argument that federal law applies to the Changes Clause. The *Au* court applied both federal and state law to determine that constructive notice satisfies the notice requirements of a federally mandated "differing site conditions" clause. 29 Ohio App.3d at 291–92, 504 N.E.2d 1209. The same court's application of state law to a federal-

ly mandated "final payment clause", *see Mon– Rite Constr. Co. v. Northeast Regional Sewer Dist.,* 20 Ohio App.3d 255, 258–59, 485 N.E.2d 799 (1984), further indicates an intent to look to the relevant state law precedents for guidance, rather than support for the proposition that federal law applies to the Changes Clause.

Unable to rely on a liberal interpretation of the notice provisions, Perini fails to demonstrate any genuine dispute as to its compliance either with the notice or the documentation requirements of the Changes Clause.[8] Perini did not notify the City of its claim for indirect costs within 30 days after receipt of each change order or submit documentation of increased costs incurred as a result of each change order.

■ First, Perini failed to comply with the notice provisions for change orders modifying work on the Valves. Change Orders 20G–33 and 20G–42 were issued in 1995 and 1996, but Perini refers only to letters submitted to the City in 1994. Letters submitted prior to the issuance of change orders cannot notify the City of damages incurred as a result of those orders. Perini's July 11, 1994 letter does not meet the notice requirement for the City's modification issued by letter on June 28, 1994. Not only does it not mention costs incurred as a result of the June 28 letter, it also specifically states that costs will be addressed in the future. *See* Marash. Aff., Ex. 5 at unnumbered p. 4. No other letters within the 30–day deadline have been brought to the attention of the Court.

Second, non-compliance with the notice provisions for change orders regarding the motors defeats Perini's claims relating to Change Orders 20G–58, 20G–60, and 20G–68. Six letters dated in 1996 cannot satisfy the notice requirements for claims arising from either 20G–58 or 20G–60, issued on January 16, 1997, or 20G–68, issued on April 15, 1997. Letters dated March 4 and March 17, 1997, fall outside the 30–day deadline for 20G–58 and 20G–60, and precede the issuance of 20G–68. A letter dated January 28, 1997, only notifies the City of a vendor's refusal to warranty its work, not of increased costs resulting from a Change Order. *See* Marash. Aff., Ex. 7 at unnumbered pp. 16–17.

Third, Perini's letters requesting an equitable adjustment of $11.6 million and compensation of $3,771,615, as well as its Notice of Claim, fail either to document the extent of the claim resulting from each Change Order issued subsequent to the completion date of Contract 20G or to comply with notice deadlines of the Changes Clause for most of the Change Orders. The October 4, 1996 letter does fall within the 30–day deadline for Change Orders 20G–53, 20G–54,[9] and 20G–57, but fails to even mention the work addressed by these Change Orders—fence work, installation of a protective canopy, and the installation of a boat pump discharge line. *See* Marash. Aff., Ex. 9 at unnumbered pp. 1–8. Similarly, the March 4, 1997 letter does not address the installation of piping or work on ports ordered by the two change orders that fall within 30 days prior to its submission, 20G–64 and 20G–65. *Id.* at unnumbered pp. 9–10.

The notification requirements are specifically intended to prevent a contractor from asserting claims for "undocumented damages" that significantly exceed the contract price. *See A.H.A. General Constr.*, 677 N.Y.S.2d 9, at 17, 699 N.E.2d 368, at 375, 1998 WL 305439, at *7 (contractor's "accumulation of $1,000,000 in undocumented damages—a full 20% over the combined contract price—is precisely the situation that the cited [notice] provisions are intended to prevent"). Perini's claim for an equitable adjustment of $16 million to Contract 20G is approximately 40% of the contract price. Noncompliance with the notice and documentation provisions impedes City action to adjust changes ordered to the contract or to contain expenses.

Perini's failure to notify the City of its indirect costs caused by the issuance of the change orders eviscerates its claim for an equitable adjustment under the Changes Clause.[10] Similarly, noncompliance with the

---

8. Perini's failure to comply with the more lenient notice and documentation requirements of the Changes Clause obviates any need to consider the existence of a conflict between the Changes Clause and the stricter notice and documentation provisions of Article 27.

9. Change Order 20G–54 actually subtracts from, rather than adds to, Perini's work under Contract 20G.

10. Because there is no genuine dispute regarding Perini's failure to comply with the notice provisions of the Changes Clause, it cannot recover under that clause based on allegations that the City's specifications were defective and/or that

notice provisions entitles the City to partial summary judgment on its cross-motion: The disposition of both motions hinges on the absence of notice and documentation of Perini's claim as required by the Changes Clause.

## V. Conclusion

While Perini half-heartedly argues that it submitted timely written notice of the general extent and monetary nature of its claims, its third cause of action ultimately rests on a liberal construction of the Changes Clause. The governing New York state law requires strict compliance with notice provisions in public contracts. Perini has not complied with either the notice or documentation required to support its claim for an equitable adjustment. Because Perini has therefore failed to "set forth specific facts showing that there is a genuine issue for trial," *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505, the City is entitled to partial summary judgment on its cross-motion. *See Westinghouse Electric*, 735 F.Supp. at 28 (summary judgment properly granted where plaintiff failed to comply with notice requirement for additional compensation for disputed work); *Huff Enterprises*, 595 N.Y.S.2d at 180 (summary judgment granted where plaintiff failed to comply with written notice provision of contract); *North Star Contracting Corp. v. New York City Transit Auth.*, 188 A.D.2d 412, 592 N.Y.S.2d 244, 244 (1st Dept.1992) (summary judgment granted for failure to comply with contract notice provisions); *A.I. Smith Elec. Contractors, Inc. v. City of New York*, 181 A.D.2d 542, 581 N.Y.S.2d 44, 44 (1st Dept. 1992) (summary judgment properly granted where plaintiff failed to comply with documentation and notice provisions of contract); *Naclerio Contracting*, 493 N.Y.S.2d at 160–61 (summary judgment granted where contractor failed to comply with documentation provisions). For the same reasons, Perini's motion for partial summary judgment—which requests an equitable adjustment under the Changes Clause—is denied.

Perini has withdrawn its first and second causes of action with prejudice. *See* Perini's

---

the City made misrepresentations. As I have discussed, recovery on Perini's third cause of action, which alleges solely that an equitable

---

Letter to the Court, dated August 5, 1998. Perini also has withdrawn its fourth cause of action—which claims breach of Contract through misrepresentation—subject to appeal of this Order, in accord with its view that this Court's decision on its third cause of action effectively grants summary judgment in favor of the City on the fourth cause of action as well. *See id.*

Because all of Perini's claims are either withdrawn or dismissed, this Order determines all issues before the Court and the Clerk is directed to close this case.

SO ORDERED.

adjustment is warranted under the Changes Clause, requires compliance with the notice provisions of that clause.