No. 30,137.

THE OLIVER FARM EQUIPMENT SALES COMPANY, *Appellant*, v. H. S. PATCH and NETTIE PATCH, *Appellees*.

(5 P. 2d 795.)

Opinion filed December 12, 1931.

*Chester I. Long, Claude I. Depew, W. E. Stanley*, all of Wichita, and *Fred A. Walker*, of Columbus, for the appellant.

*F. W. Boss*, of Columbus, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover on two promissory notes and to foreclose a chattel mortgage on a steam engine and threshing machine.

The notes were of a series of six for $321 and $322 each which defendants had executed to pay for the threshing machine included in the property covered by the mortgage.

It appears that in May, 1925, the defendant, H. S. Patch, entered into a written contract with the Nichols & Shepard Company, a concern then engaged in the manufacture and sale of threshing machines. The subject matter of the contract was the purchase of the threshing machine involved in this lawsuit. The defendant purchaser agreed to receive the machine at Columbus and pay the freight charges thereon, and agreed to pay the purchase price of

$1,929 according to the tenor of six installment notes due at specified times in the years 1925, 1926 and 1927. The contract included a warranty that the machine was "well made, of good material, and if properly used and operated will perform the work for which it is intended as well, or better, than any other make of machine of the same size working under the same conditions and on the same job." It also provided:

"If within five days from its first use, the purchaser is unable to make the machinery do the work as aforesaid he shall immediately give written notice by registered letter to Nichols & Shepard Company at Battle Creek, Mich., stating wherein it fails to fill this warranty. Reasonable time shall be allowed the company, or its workmen, to get to the machine and remedy the defect, if any, . . . If after such notice and opportunity, as above provided, the machinery cannot be made to fill this warranty, it shall be returned immediately by the purchaser to the place where it was received, with the option of the company to furnish another machine, which shall fill this warranty, or to return to the purchaser its proportion of the purchase price.

". . . The failure of any separate machine or part shall not involve other machines, or parts, or damages."

Defendant received the machine on June 2, 1925. Shortly thereafter he used it to thresh two loads of kafir corn—a fifteen-minute job—but the wheat threshing season began about a month later, at which time the first real test of the machine's efficiency was made. It did a good job of separating grain from the straw but operated continually in a cloud of dust; the machine would clog; the straw would "backlash" or wrap about the cylinder, necessitating frequent stops to remove it. After the first two or three days' trial defendant called on the company's local agent through whom he had purchased the machine and told him of the trouble he was having about the dust and the straw clogging the cylinder, and told the agent something would have to be done. Defendant also wrote the company thus:

*"Nichols & Shepard Co.:*             "COLUMBUS, KAN., 7-9-1925.

"I am writing you about this separator or feeder. It does good work, runs good and all, but the separator man and farmers are kicking about the dirt around the feeder. I never saw as dirty a machine.

"I have operated several machines and never saw one as dirty. We were threshing oats yesterday and a fog of dirt raised from the front end of machine until I could not see the man on top of machine. Now I expect you to do something about this. If you have any suggestions to make, I'll try them, but if the dirt is not stopped I sure can't use the machine this way.

". . . Please let me hear from you.             H. S. PATCH."

In response to this complaint the company sent a repair man to put the machine to rights, but he did not succeed, and defendant re-

peatedly wrote and telegraphed the company about the trouble. On July 17, 1925, he wrote:

"I would like you to do something about dirt, as it is going to cost me threshing, as farmers don't like to work in it."

The company acknowledged receipt of those letters, and at various times throughout the threshing season of 1925 it sent mechanics and other representatives to look into the trouble, but those persons failed to fix it. In February, 1926, defendant went to the office of the company at Kansas City and had a conversation with its general manager. Defendant told him of the repeated but fruitless efforts of its mechanics to eliminate the trouble in operating the machine. Defendant offered to return it, but the manager said:

"We don't want the machine. We will fix it or give you a new one."

He also told defendant to let him know a few days before the 1926 threshing season began and the company would have a man there to make the machine work as it should.

Defendant had the same experience with the machine in the seasons of 1926 and 1927 that he had in 1925. From time to time the company endeavored to correct the trouble of dirt and clogging, but not until the spring of 1928 was the source of trouble located and removed. It was then discovered that some kind of angle iron had been placed in the machine behind and below the cylinder which tended to retard the straw and chaff from moving forward. The pertinent testimony reads:

"It was finally fixed in the early part of 1928. Mr. Darling from Cherryvale and Mr. Hobbleman, a mechanic from Kansas City, came to fix it. When I got home they were there and they had the front part of the machine off. . . . We put electric wires from the house to the machine to give them some light. . . . They took out the grate behind the cylinder and the heads and the casting that held it on the concaves. Mr. Hobbleman called my attention to an angle iron across under the cylinder. He said he never saw that in a machine before. He told me he was going to town to call Kansas City. After a while he came back and said they had told him to cut that iron out. A welder was working at my place and we had him cut it out. I used the machine that year and it has never bothered me a minute since and it does good work and is satisfactory."

Defendant paid the first four notes about the times of their maturity, but claimed a set-off in damages against the last two, which are the subject of this lawsuit. The pertinent facts were developed by the pleadings, and the evidence at length was substantially as outlined above. Plaintiff's demurrer to the evidence was overruled

and its motion for an instructed verdict denied. The trial court instructed the jury that defendant was liable on the two unpaid notes, but if the jury should find there had been a breach of warranty, the company would be liable to defendant in damages, and if defendant's damages were in excess of the notes defendant should recover such excess.

The jury returned a verdict in favor of defendant for $400, but a remittitur of $50 was filed, and judgment was rendered in his behalf for $350.

Plaintiff appeals, contending that under the contract, pleadings and evidence it could not be liable in damages for breach of warranty. It stresses the fact that the threshing machine was sold to defendant under the written contract, and that his remedy for any breach was exclusively governed by its terms. That contract provided that written notice of the defect in the machine should be given to the Nichols & Shepard Company at Battle Creek, Mich., by registered letter within five days after its first use, and if the company failed to remedy such defect defendant was privileged to return the machine to the place where he received it. Defendant, of course, did neither of these things, from which fact plaintiff insists he had no defense to the notes, and that under no view of the law could plaintiff be held in damages for breach of warranty.

But the legal questions suggested by all the facts of this case can not be so easily disposed of. It is true that under the contract plaintiff might have ignored defendant's oral complaint to its agent who negotiated the sale of the threshing machine, and might have ignored the written notice which defendant gave in his letter of July 9, 1925, to the company at Kansas City. If it had done so, it might have stood on the letter of the contract, and if defendant had then failed to return the machine to Columbus he would have no defense to the notes, and would have had no claim for damages. But certainly the company could waive the giving of written notice by registered letter to Battle Creek. The company was not precluded by the contract from accepting written notice at Kansas City. It could also waive the matter of registering the letter. What was the purpose of requiring that the letter be registered? To make it certain the company would receive it. Why was the letter to be addressed to Battle Creek? Obviously so it would receive attention from some responsible official who had authority to send a mechanic to put the threshing machine to rights, if that could be done. But

the written notice must have gotten into the hands of such an officer of the company, for along came the mechanic to fix or try to fix the machine. And not one mechanic merely, but one after another were sent by the company to tinker with the machine. The contract is susceptible of an interpretation that the company had the privilege to keep trying to fix the machine. At least it did exercise that privilege for nearly three years. While the vendee was required to report any defect within the first five`days he used the machine, the company reserved to itself a reasonable time to send its workmen to remedy the defect. It had also two alternatives, one to return whatever had been paid on the purchase price, the other to furnish another machine. Throughout the protracted interval of nearly three years plaintiff continued to assure defendant it would fix the machine or furnish a new one. When defendant went to see the manager of the company and offered to return the machine, the manager said, "We don't want the machine. We will fix it or give you a new one." Moreover, the company eventually made good that promise, although it was a long time about it. In 1928 one of its experts did discover what was wrong with the machine, and the defect was corrected. Meantime, however, defendant had been annoyed with it for three threshing seasons. It had caused him much loss of time, and lost him business besides, since farmers objected to working around a machine that made so much dust; and there was testimony which the jury saw fit to believe that the time lost stopping the machine to remove straw which would "backlash" and clog the cylinder lessened its capacity as much as 400 bushels per day, at a time when threshing rates were six to seven cents per bushel. During the protracted period while plaintiff continued to send workmen who tried to correct the fault of the machine plaintiff paid the first four installment notes, but he also notified the company that he claimed damages which would have to be adjusted before he would pay the last two notes.

Plaintiff directs our attention to this language, which appears well down in the body of the contract:

"Failure of any separate machine or part shall not involve other machines, or parts, or damages."

It is suggested that this somewhat cryptic provision means that defendant bound himself never to claim damages for breach of warranty. If such interpretation is correct we can but marvel what

purpose was to be served by putting any warranty in the contract? That warranty read:

"The machinery above described is purchased and sold and received subject to the following express warranty and agreement and no other, namely:

"That it is well made of good material, and if properly used and operated, will perform the work for which it is intended as well, or better, than any other make of machine of the same size working under the same conditions and on the same job."

On the assumption that this well-sounding language meant something, we do not see that it is to be wholly vitiated by the subsequent provision that a failure of any separate machine *shall not involve* damages. Moreover, there was no failure of this threshing machine. The evidence was that it did an excellent job of separating grain from the straw, which is the main function of a threshing machine. It was defective in the one particular that the straw could not readily pass through the machine because of the misplaced angle iron, which thereby caused the cylinder to clog and caused a continuous cloud of dust at the feeding end of the separator. It would be stretching language unduly as well as unfairly to defendant—since he did not formulate its terms—to hold that the warranty for his benefit was set at naught by the debatable language of the clause which provided that the failure of a separate machine should not *involve* damages.

Counsel for plaintiff call our attention to familiar cases of this court which have held the purchaser of machinery strictly to the terms of his contract of purchase; where counterclaims for damages have been denied when the buyer's remedy was otherwise "nominated in the bond"; also, where payments on the purchase price or renewal of notes given in payment have been construed as waiver of breach of warranty. Those precedents do not govern this case. It was not the bounden duty of defendant to return the threshing machine while plaintiff was trying to discover and correct its defect; it was immaterial that he did not notify the company at Battle Creek when the company otherwise received notice and acted upon that notice. The clause in the body of the contract that "the failure of any separate machine or part shall not involve other machines, or parts, or damages," did not render nugatory the warranty under which the machine was sold nor preclude defendant's claim for damages for breach of warranty—a breach that was well pleaded and well proved.

The judgment is affirmed.