**BRECHAN ENTERPRISES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 247–84C.**

United States Claims Court.

June 26, 1987.

William B. Moore, Seattle, Wash., for plaintiff.

Sylvia Ford Brown, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This contract action involves a claim based on an alleged differing site condition. It is presently before the court upon the parties' cross-motions for summary judgment. For reasons set forth herein, both parties' motions are denied.

## FACTUAL BACKGROUND

In 1977, a breakwater was constructed at the Harbor of Port Lions in Southwestern Alaska under the direction of the United States Army Corps of Engineers ("COE"). On October 12, 1982, Brechan Enterprises, Inc. ("Brechan") entered into a contract to extend and repair the breakwater. As part of Brechan's obligation under the contract, it was required to dredge and dispose of approximately 8,700 cubic yards of material to increase the depth of the entrance channel which ran perpendicular to the breakwater. The specifications called for dredging to a uniform elevation of minus 15 feet. Within the designated limits of dredging, this translated into a requirement for dredging a minimum of 2½–3 feet of bottom material. Brechan's bid for the dredging portion of the contract was $167,500.00 for the first 6,700 yards and $22.00 per cubic yard for up to 2,000 additional cubic yards.

Section 2B of the Technical Provisions of the contract specifications dealt with dredging and provided in part as follows:

1. *Work Covered by This Section:* The work covered by this section shall include the removal and disposal of all dredged materials as specified herein or indicated on the drawings or to bedrock. Blasting shall not be performed to remove rock if encountered within the designated dredging limits.

2. *Character of Materials.* Soil explorations have been made by the Government in the area to be dredged. The locations of the explorations made are appended herein. Additional subsurface information is available at the office of the District Engineer. Rock from the existing breakwater and other debris are to be expected and, if encountered, shall not be considered materially different within the scope of clause 4 of the General Provisions. Although the results of the above-mentioned explorations are representative of subsurface conditions

at their respective locations and for their respective vertical reaches, local variations in the subsurface materials are to be expected, and if encountered, will not be considered as materially differing within clause 4 of the General Provisions.

The contract contained the standard differing site conditions clause in its General Provisions.[1] Appended to the contract were exploration logs which contained results from boring probe holes. These holes had been sunk for the original 1977 construction of the breakwater, for which no dredging had been contemplated.[2] None of the probe holes were within the area to be dredged by the contractor.

Brechan began its dredging operations on June 29, 1983 using a barge-mounted crane with a three cubic yard clamshell bucket. During most dredging processes, John Schwicht, the Government's onsite project engineer, was aboard the dredging barge to observe operations. Dredging proved to be difficult from the outset, as was observed by Schwicht in his periodic reports. Government Surveillance Report No. 148, dated June 30, 1983, for example stated that production was "painfully slow. Clamshell seems just too light to penetrate through clay-gravel layer which has been encountered. Boring logs of specifications do show that this type of material is present." Government Surveillance Report No. 150 dated July 1, 1983, stated:

Contractor shut down dredging operation in P.M. due to low productivity. Material which seems to be the most difficult to

dredge is a blue marine clay matrix around an angular gravel. This material is quite hard and clamshell we are using does not seem to have sufficient mass to penetrate.

On July 5, 1983, John Tyhuis, Brechan's project manager, wrote the following to the Contracting Officer ("CO"):

During this week ending July 2, 1983, we attempted to clam material from the entrance channel at the breakwater.... We feel the soil reports are in error in that we are encountering very hard gravelly clay.

*Please be advised that there may be a possible claim if the material is in fact different than what the soil data inferred.*

(Emphasis added.) In that same letter, Tyhuis notified the COE that Brechan planned to retain an independent soil testing firm to get a second opinion as to the classification of this material.

The firm which Brechan retained, R & M Consultants, gave a descriptive classification of the materials being dredged as "sand with some cobbles and gravel and traces [of] salt and clay." This classification described the gradation, or size of the material, not its compaction or density, which R & M did not test. On July 18, 1983, Tyhuis discussed the test results with the Resident Contracting Officer ("RCO"), Robert E. Morris. During this conversation, Tyhuis acknowledged that the gradation of the material did not substantially

---

1. The clause provided as follows:

 4. *Differing Site Conditions*
 (a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The contracting officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such

conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.
 (b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given this notice required in (a) above; provided, however, the time prescribed therefor may be extended by the Government.
 (c) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract.

2. According to defendant, the COE reviewed the 1977 soils exploration study prior to advertising the 1982 breakwater repair and dredging contract at Port Lions and concluded that no further borings were necessary within the contemplated dredging limits.

differ from that indicated in the COE's earlier test borings. On August 1, 1983, the RCO notified Brechan by letter that, based on his conversation with Tyhuis and the results of the testing done by R & M, a differing site condition did not exist. The letter went on to state that "this office considers the matter closed." Brechan did not respond in writing directly to this letter.

After Brechan had obtained a power arm excavator, dredging operations resumed on or about August 10. At first, dredging operations improved, as noted in Government Surveillance Report dated August 10, 1983: "Dredging began by noon on 10 August. Results much improved with new bucket but it appears that we will get about one load every other day. This translates into about 35 working days."

The initial progress slowed, however, and Brechan again began experiencing very difficult dredging. The surveillance report dated September 30, 1983 specifically noted that "[I]t is quite possible that material described in [the] boring logs as 'refusal on rock' was actually this material which is quite dense."

By letter dated October 5, 1983, Brechan again informed the government of a potential differing site condition:

We are still encountering extremely hard material within the dredging limits at the breakwater.

We had the site visited by Lawrence Perko (Senior Geotechnical Engineer for R & M Consultants) on September 7, 1983. Additional samples of dredged material were obtained for testing. We are awaiting results of these tests as to the nature and classification of this material.

From the record of tests provided and materials sampled in the specifications for this project we had expected no problem in digging the material in the entrance channel at the breakwater. The blow counts and descriptions of the materials led us to believe that the material would not be difficult to remove. We believe that on the exploration logs PH–5, PH–6, and PH–7 that where refusal on rock is described that there is not rock at

these elevations and it is glacial till. We are encountering this type of material in the majority of our dredging. We have not encountered any refusal on rock while digging near these areas or while driving the temporary piling for defining the dredging limits.

We reiterate our position that differing site conditions do exist if this material is glacial till.

This letter was received by the RCO on October 14, 1983. On October 19, 1983 the contracting officer telephoned Brechan to discuss the procedures to be followed in investigating a differing site condition claim by gaining access to areas yet to be dredged. During this conversation, however, a radio message came in from the dredging crew that dredging had been completed. On October 26, 1983, the RCO notified Brechan by letter that no differing site condition existed under General Provision 4 of the contract. The letter stated that Brechan's claim could not be allowed because appropriate notice had not been given before conditions were disturbed. The RCO explained that on October 7, 1983, a sieve and hydrometer test had been conducted on a sample of material previously collected by Schwicht and that the lab test verified that the material was the same as that described in the earlier exploration logs as "dense virgin" material. Since Brechan had allegedly failed to provide an opportunity to investigate the condition further, the decision could only be based on this available information.

On November 22, 1983, Brechan submitted a formal claim based on a differing site condition to the CO. Damages in the amount of $587,447.00 were sought. The claim was denied on May 16, 1984.

## DISCUSSION

### I. *The Notice Requirement*

One of defendant's two grounds for summary judgment is that Brechan's claim is barred by the doctrine of equitable estoppel. Defendant asserts that while Brechan gave written notice of a "possible" differing site condition claim on July 5, 1983,

such notice was vitiated by subsequent discussions, and by plaintiff's continuation of work with more powerful equipment without reasserting a written claim that a differing site condition existed. Defendant argues that it relied on these intervening events in that it did not undertake its own investigation. It argues that Brechan's letter of October 5, 1983 did not constitute timely written notice to the government of the alleged different site condition "before such conditions [were] disturbed."

The court has misgivings about the appropriateness of considering these circumstances from the standpoint of an estoppel. The more straight forward test would appear to be whether the contractual obligations of the parties were carried out. In any event, the same analysis which leads the court to reject the estoppel claim would lead it to deny a claim by defendant that summary judgment was appropriate based on noncompliance with the notice requirement of the clause. Consequently, the facts will be considered in the context of defendant's estoppel argument.

■ Four elements are necessary to establish an equitable estoppel: (1) the party to be estopped must know the facts; (2) he must intend that his conduct be acted upon or must so act that the party asserting estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and, (4) the party asserting estoppel must rely to his injury upon the conduct of the party to be estopped. *Emeco Indus. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973); *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir.1970). The court concludes that the third and fourth elements are not established.

■ With respect to defendant's knowledge of the "true facts," initially the court rejects defendant's argument that the July 5 letter was not written notice within the meaning of the contract because it only referred to a *"possible* claim." The requirement serves two purposes: first, to let the Government see the undisturbed conditions for evaluation purposes, and second, to allow the Government to exercise

control over the resolution of the problem. *See Central Mechanical Constr.*, ASBCA Nos. 29431, 29432, 29433, 85–2 BCA ¶ 18,-061 (1985). It has to be borne in mind that while there are legal ramifications from the method by which the contractor notifies the Government, primarily the notification requirement is a litigation avoidance mechanism. Its purpose is practical, not punitive. It is a device to stimulate the Government to take its own investigative action and perhaps corrective measures in conjunction with the contractor. For that reason, notice does not need to be in any specific format; it need only clearly show the existence of the condition. *See T & B Builders, Inc.* ENG BCA 3664, 77–2 BCA ¶ 12,663 (1977); *J.J. Welcome Constr. Co.*, ASBCA 19653, 75–1 BCA ¶ 10,997 (1974).

■ Defendant itself apparently took the view during the summer of 1983 that a differing site condition had been properly alleged. The letter of August 1 plainly presumed that a differing site claim had been asserted. More clearly, the RCO's letter of October 26, 1983 begins, "A differing site condition was first alleged on July 5, 1983, as stated in your [letter]." The declaration of the RCO, submitted in support of defendant's motion, further states that Brechan's July 5 letter "put the Government on notice of a possible differing site conditions claim," and that the October 5 letter "again put the Government on notice." Under these circumstances the court concludes that the July 5 letter satisfied the requirement of a written notification.

■ Defendant next argues that Brechan's failure to submit a new claim after the RCO's August 1 rejection until virtually all the work had been done should foreclose plaintiff's complaint, since defendant lost a valuable opportunity to test the actual subsurface conditions before completion. The clause in question requires the CO to promptly investigate the differing site claim. While it was arguably reasonable for the Government to rely on Brechan's initiative to undertake the soil test, and for it later to assume that the claim was withdrawn, it does not follow that defendant's

awareness of continuing difficulties could not constitute a second notice sufficient to activate a duty to investigate.

The requirement of a writing has been waived where the Government in fact has knowledge of the conditions and difficulties encountered by the contractor and where no prejudice was shown to have resulted from lack of timely written notice. *E.g., Xplo Corp.,* DOT CAB No. 1250, 86–2 BCA ¶ 18,863 (1986) (contractor provided notice to technical representative upon encountering conditions other than as represented in the contract drawings; that knowledge imputed to CO); *Central Mechanical Constr.,* 85–2 BCA ¶ 18,061 (oral notice sufficient); *L.B. Samford, Inc.,* DOT CAB No. 1457, 85–2 BCA ¶ 18,081 (1985) (CO representative had duty to communicate to CO conditions encountered during work); *cf. Schnip Bldg. Co. v. United States,* 227 Ct.Cl. 148, 645 F.2d 950 (1981); *Hoel-Steffen Constr. Co. v. United States,* 197 Ct.Cl. 561, 456 F.2d 760 (1972).

Here, there is abundant evidence in the record to show that the onsite project engineer, Schwicht, had actual knowledge that Brechan was encountering significant difficulties in its dredging operations indicative of potentially materially different soils than those described in the contract documents. Schwicht was on the barge observing dredging operations for the greater part of each working day. Even though Schwicht was impressed with the penetration power of the equipment Brechan had acquired in August, he knew there were not many productive dredging days. Moreover, on September 30, 1983, more than 19 days before the RCO received Brechan's second notice, Schwicht stated that it was quite possible that material described in boring logs as "refusal on rock" was actually the harder-type material Brechan was dredging. In his deposition Schwicht referred to the material as "extremely hard" or "well cemented," and the entire project as "very tough going."

---

**3.** On October 19, 1983, when the COE directed the dredging activities to cease, the RCO requested that the contractor obtain samples of

As in *General Casualty Co. v. United States,*

> the resident engineer was clothed by the contracting officer with authority to be on the job and see that the work was performed. In the *Shepherd* case the court held that the resident engineer ... had the duty to communicate to the contracting officer matters which were brought to his attention regarding conditions encountered in the excavation, and that notice to the resident engineer constituted compliance with the contract.

130 Ct.Cl. 520, 533, 127 F.Supp. 805 (1955) (citing *Shepherd v. United States,* 125 Ct.Cl. 724, 113 F.Supp. 648 (1953)). It is not necessary for the court at this stage to determine whether in fact these circumstances satisfy the notice requirement. It is sufficient for the present to find that the facts could sustain an inference, which, under the law, would permit the court to find notice beyond August 1 and before October 5, 1983. *See Allied Contractors, Inc. v. United States,* 149 Ct.Cl. 671, 675, 277 F.2d 464 (1960).

■ Although Brechan had completed dredging by the time the RCO had directed it on October 19th to cease, the matter of prejudice relates to at least two unresolved factual issues: when the Government should be considered as on notice of a differing site condition; and whether defendant was effectively prevented from verification of Brechan's claim and the development of alternative remedial procedures.[3] *See Schnip Bldg. Co.,* 227 Ct.Cl. at 163–64, 645 F.2d at 659. Defendant's estoppel argument, in the context of a motion for summary judgment, thus fails.

## II. *Differing Site Condition*

[6] Both parties seek summary judgment on the issue of whether in fact there was a differing site condition. Brechan asserts a Type I condition, which is described in the contract as subsurface or latent physical conditions at the site differing materially from the conditions indicated

---

dredged material. These samples were taken but are unexamined.

in the contract. To succeed on the merits, Brechan must show that: (1) actual conditions at the site differed materially from those indicated in the contract documents; (2) the differing site conditions could not have been ascertained by a reasonable site investigation and a pre-bid review of contract documents; (3) it relied on its interpretation of the contract documents; and (4) it was damaged. *Ballenger Corp.,* DOT CAB No. 74–32, 84–1 BCA ¶ 16,973 at 84,440 (1984); *Meredith Constr. Co., Inc.,* DOT CAB No. 1548, 85–1 BCA ¶ 17,895 (1985); *see McCormick Constr. Co.,* 12 Cl.Ct. 496 (1987).

 Although the parties have set forth facts by way of affidavits, depositions, and supporting documentation as to each of these four elements, the court is persuaded that this case is not susceptible to resolution on summary judgment. RUSCC 56 requires that the moving party show "that there is no genuine issue as to any material fact" on the entire record and that it is therefore entitled to judgment as a matter of law. In this connection, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985); *Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503 (1985). Summary judgment is a harsh remedy, and it is necessary to have a complete and solid record in order for it to be appropriate. *See Kennedy v. Silas Mason Co.,* 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); *Gregory Lumber Co.,* 9 Cl.Ct. at 528.

After considering the affidavits and documentary evidence and after reading the depositions, it is obvious to the court that any number of disputed issues remain. The court must determine after weighing the evidence, whether a reasonable and prudent contractor would have anticipated, based on the contract documents, the actual soil conditions. *See P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed.Cir.1984); *McCormick,* at 498. This implicates the sufficiency of the boring logs, and raises a question as to the materiality of the actual differences between what was forecast and what was experienced. It is apparent to the court that there is substantial evidence to support the view that what plaintiff encountered was glacial till, a substance similar in gradation but arguably substantially different in density from what it could reasonably have anticipated. The very length of time it took to complete the project given the original Government estimate supports Brechan's position. There are contra-indications, however. Some of the original test borings arguably could have put Brechan on notice of unusually dense material. The July test results also give some support to defendant's view that the materials encountered should have been anticipated. In sum, since the case has not been submitted for final determination on the record, these issues, as well as those relating to whether and when defendant was on notice of a differing site condition claim and whether it was prejudiced, are all peculiarly fact-intensive and make summary judgment inappropriate. *See McCormick,* at 498–499; *Robert E. McKee, Inc. v. City of Atlanta,* 414 F.Supp. 957 (N.D.Ga.1976).

## CONCLUSION

For the reasons stated herein, the motions for summary judgment of both parties are denied.