(227 P.3d 29)
No. 101,131

RAZORBACK CONTRACTORS OF KANSAS, INC., *Appellant*, v. THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, *Appellee*.

Opinion filed April 2, 2010.

*Fred Bellemere, III*, and *Paul G. Schepers*, of Seigfried, Bingham, Levy, Selzer & Gee, of Kansas City, Missouri, for appellant.

*LeeAnne Hays*, of Johnson County Legal Department, of Olathe, for appellee.

Before MCANANY, P.J., GREEN and MALONE, JJ.

MCANANY, J.: This appeal centers on the contract between Razorback Contractors of Kansas, Inc. (Razorback), and the Johnson County Board of County Commissioners (the Board) for construction of a sanitary sewer line in southern Johnson County. The agreed contract price was $2,393,320.76. Razorback claimed that during construction it encountered site conditions materially different from what previously had been disclosed. It sued the Board for additional compensation of $1,342,932, but the district court entered summary judgment in favor of the Board because Razorback failed to provide notice of its claim in accordance with the parties' contract. Razorback appeals that decision.

The Board provided prospective bidders on the project with two sets of soil boring logs taken in early 2004. The boring logs were provided in order to inform prospective bidders about the soil composition and water table on the job site. The boring logs reported information about rock formations, soil strata, and "observed" groundwater conditions at various depths in approximately 80 locations throughout the construction area. The borings were not intended to measure surface water or indicate surface conditions. Bidders were further informed about site conditions in an accompanying April 30, 2004, letter which stated:

"SITE CONDITIONS

"The project site is located in an agricultural area of southern Johnson County, Kansas. According to the site plan provided, the proposed sewer lines are generally in the floodplains of Coffee Creek and [its] tributaries. The soils in these areas are by nature typically saturated due to the natural accumulation of water by surface drainage.

"SITE PREPARATION

"The near surface soils in several areas of this project site were saturated at the time of our field exploration. The soil moisture contents will likely be high at the time of construction for the proposed sewers. Drying of these soils may be re-

quired to develop a stable base for construction activities. Discing and aeration may be sufficient to provide a stable base. However, additional stabilization measures may be required depending on the soil moisture content of the near surface soils at the time of construction. The contractor should determine the most appropriate means of soil stabilization required for the proposed work.

"EXCAVATIONS

"Excavations will be required for the proposed sewer lines. It is anticipated that the excavations will be in clay soils and shale, sandstone and limestone bedrock above and below the water table. Typical temporary dewatering techniques should be sufficient to remove any water seepage that may be encountered in the excavations. The contractor should determine the appropriate dewatering technique required to complete the work 'in the dry.'

". . . Surface drainage should be carefully controlled to prevent flow of water into the excavations."

The contract work was to be completed in 270 days. The contract provided for liquidated damages of $1,000 for each day thereafter until completion of the work.

Razorback, the successful bidder on the project, is an experienced sewer contractor with over 160 sewer and waterline projects in the Kansas City-Lawrence-Topeka area since the year 2000. Michael Martin was Razorback's project manager. George Butler Associates (GBA) was the Board's consulting engineering firm for the project. Doug Martin was GBA's senior construction observer for the project and was onsite several times each week during construction.

The work commenced on July 19, 2004. Progress meetings were held onsite in September, October, November, and December 2004, and in January and February 2005. Doug Martin, the engineer supervising the project, attended each of these meetings, prepared the agenda and minutes for each meeting, and gave Razorback an opportunity to correct the minutes of prior meetings.

In September 2004, Razorback first reported to Doug Martin that it had encountered unanticipated water conditions. The September 2004 progress meeting minutes (which Razorback reviewed and apparently approved) indicate that Razorback was experiencing "wet surface conditions and equipment problems." Razorback was a week or two behind schedule by this time. Ra-

zorback requested no time extension or additional compensation in September 2004.

During the October and November 2004 progress meetings, Razorback repeated that "wet surface conditions and equipment problems" were causing delays. Again, it made no request for a time extension or for additional compensation.

On December 7, 2004, Michael Martin sent a letter to GBA stating that

"the extremely wet ground conditions that we are experiencing on this project are causing delays in laying pipe . . . [and] the wet ground is stopping us from delivering bedding rock to the pipe laying operation. . . .

"We do not see this condition improving until either the precipitation quits for several weeks allowing the ground to dry or the temperature drops below freezing long enough to allow the ground to freeze. . . .

"This letter is to serve notice that if we don't get favorable ground conditions soon we will request a time extension based on the current unforeseen site conditions."

A week later, at the December 14, 2004, progress meeting, Razorback again reported that "wet surface conditions and equipment problems" were causing delays. Razorback did not submit a proposed time extension or price increase change order at the meeting. However, Hal Cosgrove, Razorback's president, attended this meeting and

"asked about the possibility of . . . stopping the contract time on the project until surface conditions were more favorable . . . . At this time[, Razorback's] progress is being slowed by muddy surface conditions and unexpected groundwater. Hal stated that the soil borings for the project did not indicate the presence of ground or surface water along the easements of this project."

On December 22, 2004, GBA denied Razorback's time extension request and instructed Razorback to continue working and to "investigate alternative methods for working in the mud."

At the January 2005 progress meeting, Razorback reported that muddy surface conditions caused by wet weather, unanticipated subsurface moisture, and equipment problems put it about a month behind schedule. GBA told Razorback that there would be no time extension for weather delays.

On February 23, 2005, Razorback wrote to GBA requesting a change order extending the contract performance date by 60 days

under Sections 10.05, 12.02, and 12.03 of the contract. Razorback cited "the extremely wet and muddy soil conditions at the project site." Johnson County Wastewater (JCW) approved the change order on April 19, 2005, and the date of completion was moved from April 15, 2005, to June 14, 2005.

On June 10, 2005, Razorback formally requested in writing an increase in the contract price based upon wet and muddy soil conditions on the site that it claimed were (1) materially different from the conditions ordinarily encountered and generally recognized as inherent in this type of work, and (2) substantially different from what was represented in the bid documents. According to Razorback, "[o]nce the project is completed, we will have an opportunity to [tally] costs and to present you with a final number."

On July 5, 2005, JCW denied Razorback's request, citing Sections 10.05 and 12.01 of the contract and the fact that notice of the claim was more than 60 days after February 23, 2005. JCW also cited Section 4.03 and noted that the letter of April 30, 2004, accurately described the conditions Razorback would and did encounter.

Razorback replied on July 19, 2005, stating that it had given notice of the differing conditions as early as the December 2004 progress meeting. Also, Razorback claimed that 80% of the bores in the logs were dry holes. To document its claim for a price adjustment, Razorback enclosed a "Claim Summary" which set forth the difference between its actual costs ($3.2 million) and its bid price ($1.9 million).

Razorback sued the Board for breach of contract. It also asserted a claim for breach of implied warranty based on the Board's failure to disclose the amount of ground and surface water present in the construction area.

The Board moved for summary judgment. The district court granted the Board's motion, finding that Razorback failed to comply with the notice requirements of Sections 4.03, 10.05, and 12.01 of the contract. Further, relying on *Owens v. City of Bartlett*, 215 Kan. 840, 528 P.2d 1235 (1974), and *Saddlewood Downs v. Holland Corp., Inc.*, 33 Kan. App. 2d 185, 99 P.3d 640 (2004), the court found that the Board did not waive its right to notice pursuant

to the contract. On appeal, Razorback challenges the district court's enforcement of the contract's notice provisions and the court's conclusion that the Board did not waive its right under the contract to written notice of the changed conditions.

Finally, the district court granted the Board summary judgment on Razorback's implied warranty claim. Razorback does not challenge this ruling.

Appellate review of the Board's summary judgment motion is de novo. *Central Natural Resources, Inc. v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 (2009). The applicable summary judgment standards are well known to the parties and may be found in *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009) (summary judgment standards that apply to district court also apply to appellate court on review).

*The Contract*

Section 4.03 of the contract, the changed conditions provision, allowed Razorback to request a price increase if it discovered and reported a condition that "[differed] materially from that shown or indicated in the Contract Documents." The relevant portions of Section 4.03 provide:

"4.03    *Differing Subsurface or Physical Conditions*

"A. *Notice*: If CONTRACTOR believes that any subsurface or physical condition at or contiguous to the Site that is uncovered or revealed either:

1. is of such a nature as to establish that any 'technical data' on which CONTRACTOR is entitled to rely as provided in paragraph 4.02 is materially inaccurate; or

2. is of such a nature as to require a change in the Contract Documents; or

3. differs materially from that shown or indicated in the Contract Documents; or

4. is of an unusual nature, and differs materially from conditions ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents;

"then CONTRACTOR shall, promptly after becoming aware thereof and before further disturbing the subsurface or physical conditions or performing any Work in connection therewith (except in an emergency as required by paragraph 6.16.A), notify OWNER and ENGINEER in writing about such condition. CONTRACTOR shall not further disturb such condition or perform any Work in connection therewith (except as aforesaid) until receipt of written order to do so.

    . . . .

"C. *Possible Price and Times Adjustments*

. . . .

"2. CONTRACTOR shall not be entitled to any adjustment in the Contract Price or Contract Times if:

a. CONTRACTOR knew of the existence of such conditions at the time CONTRACTOR made a final commitment to OWNER in respect of Contract Price and Contract Times by the submission of a Bid or becoming bound under negotiated contract; or

b. the existence of such condition could reasonably have been discovered or revealed as a result of any examination, investigation, exploration, test, or study of the Site and contiguous areas required by the Bidding Requirements or Contract Documents to be conducted by or for CONTRACTOR prior to CONTRACTOR's making such final commitment; or

c. CONTRACTOR failed to give the written notice within the time and as required by paragraph 4.03.A.

"3. If OWNER and CONTRACTOR are unable to agree on entitlement to or on the amount or extent, if any, of any adjustment in the Contract Price or Contract Times, or both, a Claim may be made therefor as provided in paragraph 10.05. However, OWNER, ENGINEER, and ENGINEER's Consultants shall not be liable to CONTRACTOR for any claims, costs, losses, or damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) sustained by CONTRACTOR on or in connection with any other project or anticipated project."

Section 12.01 of the contract provides that any price adjustment claim must be made in writing and in accordance with Section 10.05. The relevant provisions in Section 10.05 provide:

"10.05 *Claims and Disputes*

"A. *Notice*: Written notice stating the general nature of each Claim, dispute, or other matter shall be delivered by the claimant to ENGINEER and the other party to the Contract promptly (but in no event later than 30 days) after the start of the event giving rise thereto. Notice of the amount or extent of the Claim, dispute, or other matter with supporting data shall be delivered to the ENGINEER and the other party to the Contract within 60 days after the start of such event (unless ENGINEER allows additional time for claimant to submit additional or more accurate data in support of such Claim, dispute, or other matter). A Claim for an adjustment in Contract Price shall be prepared in accordance with the provisions of paragraph 12.01.B. . . . Each Claim shall be accompanied by claimant's written statement that the adjustment claimed is the entire adjustment to which the claimant believes it is entitled as a result of said event.

. . . .

"D. No Claim for an adjustment in Contract Price or Contract Times (or Milestones) will be valid if not submitted in accordance with this paragraph 10.05."

*Notice*

Razorback claims that substantial performance will suffice to preserve its claim. It argues that it gave actual notice of its claim and no prejudice resulted from its failure to give written notice in accordance with the contract.

Razorback relies on *Brinderson Corp. v. Hampton Roads Sanitation Dist.*, 825 F.2d 41 (4th Cir. 1987), and *Brechan Enterprises, Inc. v. United States*, 12 Cl. Ct. 545 (1987), for support. Razorback argues that whether and when the Board had actual knowledge of Razorback's ·claim and whether the Board suffered any prejudice are issues of material fact to be resolved at trial, not by summary judgment.

*Brinderson* and *Brechan* lend support for Razorback's claims if the federal common law of government contracts were to apply. In *Brinderson*, the contractor building a wastewater treatment plant encountered unusually wet conditions from rain and snow. The owner granted a time extension for completion of the project, and the contractor completed construction 13 months behind schedule. It then sought a price adjustment based, in part, on the theory that the site conditions materially differed from what the contract documents described. The trial court granted summary judgment to the government because the contractor failed to comply with the contract's written notification provision.

On appeal, the court found no applicable Virginia cases addressing the issue. However, $17 million of the $21.6 million construction cost of the project was funded by the United States Environmental Protection Agency. The supplemental conditions clause found in the contract was a provision required in all projects for which the EPA provides substantial funding. Because a substantial body of federal law has developed regarding interpretation of this federally mandated supplemental conditions clause, the appellate court concluded that the Virginia Supreme Court would follow established federal common law when considering the written no-

tice provision in the contract. 825 F.2d at 44-45. The court noted that in those cases involving federal contracts, the written notice provision had been

"the subject of litigation in the Court of Claims and in several boards of contract appeals. In those cases, the notice provision has not been given a literal construction. A more liberal approach, focusing on the purpose of the clause, has been adopted. Generally, when the owner has actual or constructive notice of the conditions underlying the claim and an opportunity to investigate, that is sufficient. [Citations omitted.]" 825 F.2d at 44.

*Brechan* involved a federal construction contract administered by the Army Corps of Engineers to repair a breakwater in southwestern Alaska. The dredging contractor encountered harder soil than anticipated. It notified the Army Corps of Engineers that " 'there may be a possible claim if the material is in fact different than what the soil data inferred.' " 12 Cl. Ct. at 547. The Army twice denied the contractor's informal changed-conditions claims before the contractor submitted a formal claim for additional compensation.

The *Brechan* court rejected the government's argument that the letter referencing a " 'possible claim' " did not meet the notice requirement under the contract and concluded that the "notice does not need to be in any specific format; it need only clearly show the existence of the condition. [Citation omitted.]" 12 Cl. Ct. at 549.

Both *Brinderson* and *Brechan* involve the interpretation and application of federally mandated contract provisions. The federal government is not a party to the contract now before us, as was the case in *Brechan*. Further, we find no indication in the record that the contract provisions at issue before us are there because of a federal mandate, such as in *Brinderson*. Federal common law applies in state court proceedings only in limited areas. A predicate for the application of federal common law is the existence of a "uniquely federal interest." See *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988). There is no federal interest demonstrated here. Hence, there is no compelling reason to apply the federal common law of contracts.

We do find, however, that other states (New York, Connecticut, Indiana, Washington, Wyoming, Iowa, and Ohio), applying their own state contract laws, have strictly construed similar written notice provisions. See *Perini Corp. v. City of New York*, 18 F. Supp. 2d 287 (S.D.N.Y. 1998); *Cecio Brothers, Inc. v. Greenwich*, 156 Conn. 561, 244 A.2d 404 (1968); *Starks Mechanical, Inc. v. New Albany-Floyd*, 854 N.E.2d 936 (Ind. App. 2006); *Mike M. Johnson, Inc. v. Spokane Cty.*, 150 Wash. 2d 375, 78 P.3d 161 (2003); *Rissler & McMurry v. Sheridan Area Water*, 929 P.2d 1228 (Wyo. 1996); *Ida Grove Roofing v. City of Storm Lake*, 378 N.W.2d 313 (Iowa App. 1985); *Enviresponse v. Cty. Convention*, 78 Ohio St. 3d 353, 678 N.E.2d 519 (Ohio 1997). These cases all generally hold that written-notice-of-changed-conditions provisions should be strictly enforced. The contractors in these cases were not entitled to price increases because each failed to comply with their respective contract's notice requirements.

*Perini* involved an upgrade and expansion of the Coney Island Water Pollution Plant. The contractor's claim for an equitable adjustment equaled approximately 40% of the contract price. (In the case now before us, Razorback's claim is for more than 50% of the contract price.) In requiring strict compliance with the notice provisions of the contract, the court in *Perini* observed that the

"notice and documentation provisions serve an important public interest in that they 'provide public agencies with timely notice of deviations from budgeted expenditures or of any supposed malfeasance, and allow them to take early steps to avoid extra or unnecessary expense, make any necessary adjustments, mitigate damages and avoid the waste of public funds.' " 18 F. Supp. 2d at 294.

See *A.H.A. General Constr. v. NYCHA*, 92 N.Y.2d 20, 33-34, 677 N.Y.S.2d 9, 699 N.E.2d 368 (1998).

In *Cecio Brothers, Inc.*, the plaintiff was the subcontractor providing site preparation work for a new school. Because of an apparent error in the elevations shown in the plans, the plaintiff had to provide an additional 10,000 cubic yards of fill to establish the finished grade for the project. The plaintiff sued the owner, the Town of Greenwich, for unjust enrichment. The plaintiff's contract called for notice to the general contractor of claims for additional work within 2 days of first sustaining any loss or of proceeding with

any authorized additional work. Here, the plaintiff submitted its bill for additional fill a year after the date it completed delivery on the originally estimated amount of fill. On appeal, the Connecticut Supreme Court rejected the plaintiff's claim, concluding:

> "Had the plaintiff given timely notice in accordance with the terms of its subcontract, the contractor and the town would have had an opportunity not only then and there to have inquired into the accuracy of the plaintiff's claims as to the fill requirements but, more importantly, the town would have had an opportunity to save the added expense and keep within the limits of the public funds appropriated for the project by changing site plans or reducing costs in other portions of the project." 156 Conn. at 568.

In *Starks Mechanical, Inc.*, the contractor provided plumbing and mechanical work as part of a school renovation. When the contractor discovered defects in the design specifications, the school instructed the contractor to proceed with construction and correct the design defects. The contractor hired an engineer to redesign the plans and completed the work. In April 2004, near the end of the project, the contractor presented the school with a $1.3 million bill for the costs of redesigning the project. This was the first notice the school received of the claim for additional pay, though the court noted that "the claim admittedly arises from alleged design deficiencies dating back to 2002." 854 N.E.2d at 938. The contractor argued that its numerous communications with the school about the design defects constituted sufficient written notice of its claim to withstand summary judgment. The appellate court disagreed, finding as a matter of law that the contractor's communications with the school did not comply with the 14-day written notice requirement of the contract. 854 N.E.2d at 941-42.

In *Mike M. Johnson, Inc.*, the sewer contractor's work included making certain street improvements. That work was halted when the contractor encountered buried utilities lines. The contractor wrote to the county, stating that " 'we expect to be compensated for all costs and time associated with maintaining this road while waiting for others to complete their work.' " 150 Wash. 2d at 382. The contractor submitted a spreadsheet listing various cost items, and there followed a "lengthy period of correspondence." 150 Wash. 2d at 384. Nevertheless, the Washington Supreme Court

found that the contractor "failed to follow the formal claim procedures" under the contract. 150 Wash. 2d at 384. Citing *Bignold v. King County*, 65 Wash. 2d 817, 822, 399 P.2d 611 (1965), the court rejected the notion of an " 'actual notice' " exception, and declared that *Bignold* "reaffirms the long-established rule requiring contractors to follow contractual notice provisions unless those procedures are waived by the owner." 150 Wash. 2d at 387-88.

In *Rissler & McMurray*, the contractor encountered subsurface water in the trenches it dug in order to lay a new water line. The contractor also incurred additional time and costs when it encountered utility lines not shown in the plans. The contractor made verbal complaints to the supervising engineers, and the contractor believed its complaints were documented in the minutes of weekly project meetings. When the water line was completed and tested, the contractor was required to repair numerous leaks caused by ineffective bedding materials required by the contract specifications. Those repairs were completed on August 10, 1993. The contract required claims to be filed within 30 days of the event giving rise to the claim. On September 16, 1993, the contractor delivered to the supervising engineers its notification of claim. The owner failed to pay, the contractor sued, and the district court granted summary judgment in favor of the owner.

On appeal, the Wyoming Supreme Court found the mandatory claim procedure in the contract to be clear and unambiguous. Giving the contractor every favorable inference, the last day for filing a claim was September 10, 1993, 6 days before the contractor's claim. Finding no evidence that the owner agreed to waive the requirement of timely written notice, the Supreme Court affirmed the entry of summary judgment. 929 P.2d at 1232-33.

In *Ida Grove Roofing*, the city hired the contractor to replace a roof on the city water works plant. The city estimated in the plans that the thickness of the roof insulation to be removed was 2 to 6 inches. After commencing the work, the contractor discovered that the insulation was up to 12 inches thick. In affirming the trial court's denial of additional compensation, the appellate court noted:

"Whether or not the condition was concealed and did not become apparent until work began on the third section, a change order was required by the contract before additional compensation would be allowed. . . .

. . . .

After discovering the additional thickness of the insulation on the third section, the plaintiff did not stop work and obtain a change order, but instead allegedly told the engineer additional compensation would be sought and later sent a letter." 378 N.W.2d at 314-15.

In *Enviresponse*, the contractor was hired to clean up contaminated waste at the site where a convention center was being constructed. The contract provided that any increase in the amount of work to be done would be paid for on a per-unit basis. The contractor uncovered more waste than anticipated and orally notified the owner before proceeding with the work, but failed to submit a written change order for approval. In affirming summary judgment against the contractor, the Ohio Supreme Court stated:

"It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer. [Citations omitted.]" 78 Ohio St. 3d at 360-61.

It has long been public policy in Kansas that " 'freedom of contract is not to be interfered with lightly.' [Citations omitted.]" *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 770, 112 P.3d 81 (2005). In the case now before us, the district court accurately stated:

"If the language of a contract is clear and unambiguous, the parties to a lawful contract are entitled to have it enforced as written. *See Endicott v. DeBarbieri*, 189 Kan. 301, 304, 369 P.2d 241 (1962). 'Parties are free to contract for any type of . . . notice they desire,' and when a type of notice is specified, 'the provision is to be enforced as written, whether it results in actual notice or not.' *Fourth Nat'l Bank & Trust Co. [v.] Mobil Oil Corp.*, 224 Kan. 347, 354, 582 P.2d 236 (1978)."

In *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.*, 224 Kan. 347, 582 P.2d 236 (1978), the court strictly construed the requirement that stockholders tender their shares by a certain date to satisfy the terms of a stock purchase offer. As Razorback aptly points out, the notice of tender required for the stock tender is a

far cry from the notice requirement in a construction contract. However, our Supreme Court in *Mobil*, 224 Kan. at 353, made the following general observations regarding Kansas contracts:

"The basic legal principles here applicable are well expressed in 17 Am. Jur. 2d, *Contracts*, § 242 pp. 627-629 (1964):

" 'It is a fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction. In other words, the interpretation or construction of a contract does not include its modification or the creation of a new or different one. It must be construed and enforced according to the terms employed, and a court has no right to interpret the agreement as meaning something different from what the parties intended as expressed by the language they saw fit to employ. A court is not at liberty to revise, modify, or distort an agreement while professing to construe it, and has no right to make a different contract from that actually entered into by the parties. *Courts cannot make for the parties better or more equitable agreements than they themselves have been satisfied to make, or rewrite contracts because they operate harshly or inequitably as to one of the parties, or alter them for the benefit of one party and to the detriment of the other, or, by construction, relieve one of the parties from terms which he voluntarily consented to, or impose on him those which he did not.' "*

As most recently stated by our Supreme Court in *National Bank of Andover v. Kansas Bankers Surety Company*, 290 Kan. 247, Syl. ¶ 2, 225 P.3d 707 (2010):

"Competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake, or duress a party who has entered into such a contract is bound thereby."

Razorback relies upon the holdings in *National Union Fire Ins. Co. v. FDIC*, 264 Kan. 733, 957 P.2d 357 (1998); *Reger v. Sours*, 181 Kan. 423, 311 P.2d 996 (1957); *Oliver Farm Equipment Sales Co. v. Patch*, 134 Kan. 314, 5 P.2d 795 (1931); and *Almena State Bank v. Enfield*, 24 Kan. App. 2d 834, 954 P.2d 724 (1998).

In *Almena*, the Bank made a mortgage loan to the Enfields. The note required the Enfields to provide the Bank, upon request, any financial statements or information the Bank deemed necessary. The Enfields made all their required note payments, and the note was never criticized or classified by the bank examiners. However,

the Bank called the note when it requested copies of the Enfields' income tax returns and the Enfields refused to supply them.

The next day, the Enfields brought their tax returns to the Bank to be examined but would not permit the Bank to copy them. At the same time, the Enfields furnished to the Bank their 1995 financial statement. The Bank then brought this foreclosure action. This appeal followed the entry of summary judgment in favor of the Enfields.

In reversing the district court, the court on appeal considered whether the doctrine of substantial performance applied. The court declared:

"'Substantial performance is shown when the following circumstances are established by the evidence: (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party, and (3) such benefits are retained by the other party.' [Citations omitted.]" 24 Kan. App. 2d at 839.

The issue in *Almena* did not involve notice but performance of contract obligations to avoid breach. Here, the issue is not whether Razorback substantially performed the work required of it pursuant to the contact. The work was done, and the Board accepted it and paid Razorback in accordance with the contract. Here, the issue is notice and whether this court should, as Razorback would have us do, simply disregard Section 10.05D of the contract.

*Reger* involved a lease-purchase agreement. The contract did not provide that time was of the essence. The court found that when plaintiff sought to exercise his option to purchase, defendant engaged in evasive conduct to prevent plaintiff from tendering payment. Under the circumstances, plaintiff did not forfeit the right to purchase the property. Further, "[t]he privilege to declare forfeiture was waived by the acceptance of the mentioned payments long after plaintiff had been in arrears." 181 Kan. at 426-27.

The issue of waiver is one we will address shortly. In the meantime, we find no evidence that the Board interfered in any way with Razorback's ability to give proper notice in accordance with the contract, as was the case in *Reger*.

*National Union Fire* involves a certified question from the United States Court of Appeals for the Tenth Circuit regarding

" 'whether the notice-prejudice rule which applies to notice of loss provisions of a fidelity bond would also apply to the bond's proof of loss requirement.' " 264 Kan. at 734. In resolving the issue, the Kansas Supreme Court noted the federal district court's observations about the common characteristics shared by fidelity bonds and insurance contracts and the application of insurance law to a fidelity bond's proof of loss requirement. The district court noted " 'the numerous Kansas decisions holding that insurance policies are to be strictly construed against the carrier and in favor of the insured when a policy provision is ambiguous.' [Citations omitted.]" 264 Kan. at 749.

Our Supreme Court found "no compelling reason . . . for allowing the insurer to avoid performing a duty purchased by the insured's premium unless the insured's delay caused loss to the insurer. This would be true for both notice of loss and proof of loss provisions in the policy or bond." 264 Kan. at 751.

The language of *National Union Fire* is narrow in its focus. An entire body of law has developed regarding the interpretation and enforcement of insurance policies and dealings between insurers and their insureds. That body of law has been informed by the unique characteristics of the insurance industry and its special relationships with its insureds. *National Union Fire* involved a purchaser of an insurance/surety product. The case before us involves a seller of construction services. The distinctions are too many and too significant to paint owners in construction contracts with the same brush used for insurers in dealing with their insureds.

In *Oliver Farm Equipment Sales,* Oliver sold a threshing machine to Patch on credit, taking back a series of promissory notes. Oliver warranted that the thresher " 'will perform the work for which it is intended as well, or better, than any other make of machine of the same size working under the same conditions and on the same job.' " 134 Kan. at 315. The warranty provided that " 'if within five days from its first use, the purchaser is unable to make the machinery do the work as aforesaid he shall immediately give written notice.' " 134 Kan. at 315.

A month after buying the thresher, Patch wrote to the plaintiff, stating: " 'It . . . runs good and all, but the separator man and

farmers are kicking about the dirt around the feeder. I never saw as dirty a machine. . . . Now I expect you to do something about this. . . . I sure can't use the machine this way.' " 134 Kan. at 315. Over the next 3 years Oliver sent various repairmen to attempt repairs. When Oliver sued on the notes, Patch counterclaimed and prevailed on his claim for damages caused by the defective thresher.

On appeal our Supreme Court held that Oliver waived strict compliance with the notice requirement in its warranty. "[P]laintiff might have ignored defendant's oral complaint to its agent . . . and might have ignored the written notice. . . . If it had done so, it might have stood on the letter of the contract." 134 Kan. at 317. But by sending "one [mechanic] after another . . . to tinker with the machine," Oliver waived its right to strict compliance with the contract's notice provision. 134 Kan. at 318.

Rather than supporting Razorback's position, *Oliver* suggests that the plaintiff may have demanded strict compliance with its notice requirement but waived that right by its conduct over a 3-year period.

Here, the contract is between knowledgeable and experienced contracting parties. Section 4.03 of the contract requires the contractor not only to give the owner and project engineer written notice of conditions on the job site that are materially different from what was shown in the contract documents, but also to immediately stop work on the site and proceed no further until receipt of a written order to do so.

Further, Section 10.05 requires the contractor to provide the project engineer written notice of its claim for extra compensation within 30 days after the start of the event giving rise to the claim. The contractor must then provide the project engineer with the amount of the claim along with supporting data within 60 days after the start of the event giving rise to the claim. Section 10.05D makes compliance with these notice requirements a prerequisite for any claim for additional compensation under the contract.

Razorback first mentioned wet surface conditions in September 2004, but it did not stop work at that time. The Board certainly was not on notice of any possible claim for extra compensation

since wet surface conditions would clearly be within the contemplation of the contracting parties as outlined in the Board's April 30, 2004, letter to bidders.

At the October progress meeting, Razorback did not notify the project engineer that it would be making a claim to increase the contract price due to the wet conditions on the site.

In February 2005, Razorback made a request for a change order with respect to the time for performance but not for extra compensation. It made no request for additional compensation until June 2005, when the project was completed and almost 2 months after its originally scheduled completion date. When it did demand additional compensation, it tendered a one-page document without supporting data that merely identified its claimed "Actual Sanitary Sewer Cost" of $3,286,009 less its "Sanitary Sewer Cost Estimate" of $1,943,077 to arrive at $1,342,932, the amount claimed.

Razorback clearly failed to comply with the notice requirements of Sections 4.03 and 10.05. It gave its formal written notice about 9 months after the wet conditions were first encountered. Before its written notice it had never expressed, orally or otherwise, its intent to seek additional compensation for these wet conditions. The Board was entitled to notice in accordance with the provisions of the contract that the parties freely and voluntarily entered into. Accordingly, the district court correctly ruled that there remained no genuine issue of material fact regarding Razorback's failure to perform in accordance with the contract terms.

*Waiver*

Razorback's waiver contention is rather confusing. Razorback contends that the district court erred in relying on *Owen v. City of Bartlett*, 215 Kan. 840, 528 P.2d 1235 (1974), and *Saddlewood Downs v. Holland Corp., Inc.*, 33 Kan. App. 2d 185, 99 P.3d 640 (2004), in finding there had been no waiver of the contract's notice provision. Razorback states that *Owen* and *Saddlewood* "involve a completely different context for waiver." Yet Razorback does not provide any analysis to support the existence of a waiver, other than its conclusory remark that "[t]here is a fact dispute over whether the Board's acceptance of Razorback's tardy written notice of a

claim for additional time and the Board's initial action on Razorback's oral claim for a contract price adjustment are so 'isolated' as to preclude waiver." A point raised incidentally but not briefed or argued is deemed abandoned. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009); *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008). Nevertheless, we will address the issue.

The district court observed that in *Owens* "the parties, throughout the performance of the contract, entirely disregarded the writing requirement for extra or additional work." Razorback does not attempt to distinguish *Owens* by directing us to evidence that the Board consistently disregarded the notice requirements of the contract. Rather, it directs us to one event in February 2005, which we will address shortly.

With respect to *Saddlewood*, the district court noted the fact that the owner had expressly authorized extra work and had paid for it. From these cases, the district court concluded that "an isolated instance of failing to enforce a contractual requirement is not enough to establish a waiver of that requirement." Razorback does not argue that this is an incorrect statement of the law of waiver or that there was a consistent pattern of the Board waiving the contract's notice requirements.

Waiver is the intentional relinquishment of a known right. *Postal Savings & Loan Ass'n v. Freel*, 10 Kan. App. 2d 286, 287, 698 P.2d 382 (1984). Waiver may be inferred from conduct. See *Lyons v. Holder*, 38 Kan. App. 2d 131, Syl. ¶ 7, 163 P.3d 343 (2007). However, in order to establish waiver there must be evidence that manifests, in an unequivocal manner, an intent that is inconsistent with the intent to claim a right. See *Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*, 250 Kan. 722, 725-26, 830 P.2d 35 (1992). Therefore, in order to create a genuine issue of material fact on the issue of waiver and thereby avoid summary judgment, it was incumbent upon Razorback to direct the district court (and us) to evidence from which a jury could conclude that the Board, in an unequivocal manner, manifested its intention to relinquish its right to written and timely notice of any claim for additional compensation in accordance with the contract's terms.

Razorback refers us to the late written notice it gave the Board of its claim for additional time to complete the work. The Board rejected Razorback's oral requests to extend the contract's performance deadlines in December 2004 and January 2005. On February 23, 2005, Razorback gave written notice of its request for a change order extending the contract performance date an additional 60 days. Razorback asserted no claim for additional compensation. On April 19, 2005, the Board extended the date for completion and final acceptance of the work to June 14, 2005.

The Board rejected Razorback's oral attempts to extend performance until written notice was given in February 2005. Further, the right to insist on timely completion of the work is clearly distinct from the right to receive timely notice of a claim for additional compensation for the work. We fail to see how this one extension of Razorback's performance time constitutes evidence that unequivocally manifested the Board's intent to relinquish its right to timely, written notice of a claim for additional compensation. If the Board did demonstrate in an unequivocal manner its intent to waive written notice by accepting Razorback's February 23, 2005, time extension request, and if this notice waiver extended to a claim for extra compensation (which Razorback did not ask for at the time), then Section 10.05 of the contract nevertheless required Razorback to follow-up with supporting data on its claim within 60 days thereafter. There is no evidence that Razorback did so.

Accordingly, we are convinced that the district court was correct in finding no genuine issue of material fact on the claim that the Board waived its right to timely written notice of Razorback's claim for additional compensation.

Affirmed.